847 P.2d 1156

**Ester HARRIS, Plaintiff–Appellant,**

v.

**STATE of Idaho, DEPARTMENT OF HEALTH & WELFARE, and John Does I through IV, Defendants–Respondents.**

No. 19514.

Supreme Court of Idaho,
Pocatello, September 1992 Term.

Dec. 31, 1992.

Rehearing Denied March 25, 1993.

Holden, Kidwell, Hahn & Crapo, Idaho Falls, for plaintiff-appellant. Marie T. Tyler, argued.

Racine, Olson, Nye, Cooper & Budge, Pocatello, for defendants-respondents. William D. Olson, argued.

McDEVITT, Justice.

## STATEMENT OF THE CASE

Appellant Ester Harris brought suit against the State of Idaho, Department of Health and Welfare ("Department"), praying for the imposition of vicarious liability for injuries sustained from the tortious acts of an allegedly negligently managed juvenile placed in the care and custody of the Department. The juvenile was convicted of two counts of the infamous crime against nature, one count of rape, one count of grand theft, and one count of

second degree burglary, all perpetrated against Harris, an elderly widow.

On April 9, 1989, the juvenile assailant, Adrian Barajas, burglarized Harris' apartment and brutally raped and sodomized her. A year later, on April 10, 1990, Barajas pleaded guilty to the crimes outlined above. Prior to the assault on Harris, Barajas's criminal record included four misdemeanors, three involving petit theft and one misdemeanor battery. There were no prior incidents involving sexual misconduct, violent aggression, or any felony. The battery resulted from bloodying the nose of another boy in a fistfight. During the disposition hearing of the most recent crime in this series of misdemeanors, the magistrate entered a decree committing legal custody of Barajas to the Department for out-of-home placement subsequent to four days detention in jail and an order of restitution. The court decree, entered December 22, 1988, adopted almost wholly the recommendations of a Mr. Moulton who had performed a clinical report on Barajas shortly after his arrest. Moulton's report did not evidence any finding or suggestion that Barajas seriously endangered the public safety. Barajas, who had been released Christmas Day to the physical possession of his parents, was still under the legal care and custody of the Department at the time of the commission of the crimes.

Subsequent to Barajas's commitment to the custody of the state, the Department interviewed Barajas and family members, did an intake evaluation, completed a psychological evaluation of Barajas, conducted a staff conference to consider treatment and placement options, and assigned the case to a case manager, consistent with its usual procedure. The evaluations performed on Barajas revealed his angry nature and proclivity to aggression, and diagnosed the possibility that he might pose an above average sexual threat to his "female peers" due to past sexual abuse suffered by Barajas and his consequent need to prove his manliness. The whole intake process was completed by January 4, 1989. Thereafter, the Department lost touch with Barajas and unsuccessfully attempted to regain contact. Barajas had dropped out of school, his family residence had been abandoned, and his mother had quit her job. Barajas momentarily surfaced the afternoon preceding his brutal violation of Harris, at which time he was questioned by an officer in connection with a reported harassment and released.

On April 30, 1991, the Department filed a Motion for Summary Judgment based on the following: (1) plaintiff's failure to timely file a notice of tort claim under I.C. §§ 6–905 and 6–908; (2) governmental immunity based on the "statutory function" exception under I.C. § 6–904A(1); (3) governmental immunity based on the "assault and battery" exception under I.C. § 6–904(3); and (4) governmental immunity based on the "reckless, willful and wanton" conduct exception under I.C. § 6–904A(2). On July 29, 1991, the court entered a Memorandum Opinion and Order granting the motion for part (4) only. Plaintiff now appeals from this order, while the Department seeks a decision affirming summary judgment.

The issues on appeal are:

I. Whether a genuine issue of material fact exists concerning the reckless, willful, or wanton nature of the Department's conduct in supervising its charge, Adrian Barajas.

II. Whether the Department qualifies by definition for immunity under I.C. § 6–904A(2).

III. Whether I.C. § 6–904A(2) is constitutional.

## STANDARD OF REVIEW

 Rule 56(c) of the Idaho Rules of Civil Procedure states that summary judgment is to be "rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). This Court exercises free review of a constitutional issue because it is purely a question of law. *Sun Valley Co. v. City of Sun Valley*, 109 Idaho 424, 428, 708 P.2d 147, 151 (1985).

■ A strong line of cases weaves a tight web of authority that strictly defines and preserves the standards of summary judgment. The reviewing court must liberally construe disputed facts in favor of the nonmoving party and make all reasonable inferences in favor of the party resisting the motion. *McCoy v. Lyons*, 120 Idaho 765, 769, 820 P.2d 360, 364 (1991); *G & M Farms v. Funk Irrigation Co.*, 119 Idaho 514, 517, 808 P.2d 851, 854 (1991); *Kline v. Clinton*, 103 Idaho 116, 120, 645 P.2d 350, 354 (1982); *Petricevich v. Salmon River Canal Co.*, 92 Idaho 865, 868, 452 P.2d 362, 365 (1969). If the record contains any conflicting inferences upon which reasonable minds might reach different conclusions, summary judgment must be denied. *McCoy*, 120 Idaho at 769, 820 P.2d at 364; *Kline*, 103 Idaho at 120, 645 P.2d at 354. Nevertheless, when a party moves for summary judgment, the opposing party's case must not rest on mere speculation because a mere scintilla of evidence is not enough to create a genuine issue of fact. *McCoy*, 120 Idaho at 769, 820 P.2d at 364; *G & M Farms*, 119 Idaho at 517, 808 P.2d at 854; *Kline*, 103 Idaho at 120, 645 P.2d at 354. *See generally, Loomis v. City of Hailey*, 119 Idaho 434, 807 P.2d 1272 (1991); *Doe v. Durtschi*, 110 Idaho 466, 469, 716 P.2d 1238, 1241 (1986); *Anderson v. City of Pocatello*, 112 Idaho 176, 731 P.2d 171 (1986); *Anderson v. Ethington*, 103 Idaho 658, 660, 651 P.2d 923, 925 (1982).

■ The burden of proving the absence of a material fact rests at all times upon the moving party. *McCoy*, 120 Idaho at 769, 820 P.2d at 364; *Petricevich*, 92 Idaho at 868, 452 P.2d at 365. This burden is onerous because even "circumstantial" evidence can create a genuine issue of material fact. *McCoy*, 120 Idaho at 769, 820 P.2d at 364; *Petricevich*, 92 Idaho at 868, 452 P.2d at 365. However, the Court will consider only that material contained in affidavits or depositions which is based upon personal knowledge and which would be admissible at trial. *Petricevich*, 92 Idaho at 869, 452 P.2d at 366. Summary judgment is properly issued when the nonmoving party bearing the burden of proof fails to make a showing sufficient to establish the existence of an element essential to that party's case. *Nelson v. Steer*, 118 Idaho 409, 410, 797 P.2d 117, 118 (1990); *Dekker v. Magic Valley Regional Medical Center*, 115 Idaho 332, 333, 766 P.2d 1213, 1214 (1988).

## I.

## RECKLESS, WILLFUL AND WANTON CONDUCT UNDER I.C. § 6–904A(2) AND § 6–904C(2)[1]

■ The district court correctly found that no issue of material fact existed as to

> A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent and without reckless, willful and wanton conduct as defined in section 6–904C, Idaho Code, shall not be liable for any claim which ... [a]rises out of injury to a person or property by a person under the supervision, custody or care of a governmental entity....

This Court has construed the statutory scheme excerpted above to outline a three-step process that a court must apply in deciding whether to invoke governmental immunity. *See Olguin v. City of Burley*, 119 Idaho 721, 723, 810 P.2d 255, 257 (1991); *Czaplicki v. Gooding Joint School Dist.*, 116 Idaho 326, 330, 775 P.2d 640, 644 (1989). In considering a motion for summary judgment requesting dismissal of a complaint against a governmental entity and its employees under the Idaho Tort Claims Act, the trial court must answer whether tort recovery is allowed under the laws of Idaho; and, if so, whether an

1. The authority by which an aggrieved plaintiff may ingress governmental immunity is I.C. § 6–903(a) providing that:

> Except as otherwise provided in this act, every governmental entity is subject to liability for money damages arising out of its negligent or otherwise wrongful acts or omissions and those of its employees acting within the course and scope of their employment or duties, whether arising out of a governmental or proprietary function, where the governmental entity if a private person or entity would be liable for money damages under the laws of the state of Idaho....

Where a court must construe facts in a light most favorable to the party opposing the motion, the trial court naturally and properly assumed that a private party in the same shoes as the Department would be liable under state law, thus clearing the first statutory hurdle. I.C. § 6–904A(2) limits the government's potential liability under section 6–903, providing that:

whether the Department was reckless, willful, and wanton in its supervision of its legal charge Barajas, and consequently that I.C. § 6–904A(2) shielded the Department from liability. The applicable test for "willful, and wanton conduct" can be derived from *Jacobsen v. City of Rathdrum*, 115 Idaho 266, 270–71, 766 P.2d 736, 740–41 (1988), which construes Idaho's Recreational Use Statute. The *Jacobsen* court construed the Recreational Use Statute as converting those who use property for recreational purposes to the status of trespassers for purposes of landowner liability. The duty of a landowner to a trespasser is "to refrain from willful or wanton acts which might cause injuries." *Huyck v. Hecla Mining Co.*, 101 Idaho 299, 301, 612 P.2d 142, 144 (1980). The *Jacobsen* analysis of "willful and wanton" conduct is instructive in this case because the Court embraces a definition of "willful and wanton" that is much the same as the definition found in I.C. § 6–904C for "reckless, willful and wanton" conduct. *Jacobsen* defines "willful and wanton" conduct as conduct which is present if the person "intentionally does or fails to do an act, knowing or having a reason to know facts which would lead a reasonable man to realize that his conduct not only creates unreasonable risk of harm to another, but involves a high degree of probability that such harm would result." *Jacobsen*, 115 Idaho at 270, 766 P.2d at 740. According to *Jacobsen*, the key element in this definition is knowledge.[2] *Id.*, 115 Idaho at 272, 766 P.2d at 742. The type of knowledge envisioned by the *Jacobsen* Court implies an element of foreseeability in the phrase "having reason to know." This foreseeability, as applied to this case, contemplates more than the mere possibility of aggressive tendencies harbored by the state's ward. The concept of foreseeability is much more narrowly drawn in this circumstance. The specific harm, *i.e.* violence, particularly of a sexual

nature, toward members of the public other than Barajas's peers must be manifest or ostensible, and highly likely to occur. To hold otherwise would impose a debilitating burden on the state, requiring it to infer the highest social risk from a ward's minimal antisocial behavior, against which it would have the unequivocal duty to protect the public. Idaho Code § 6–904A(2) was intended to render the state immune from the *unpredictable* acts of third persons, including parolees, persons receiving mental counseling or care, or persons under the state's custody, supervision, or care.

According to the strictures of this test, there is no evidence in the record to indicate that the state's employees intentionally and knowingly did or failed to do any act which created an unreasonable risk of harm to Harris. Specifically, no act or omission of the employees involved a high degree of probability that *the kind of harm which Harris suffered would result therefrom*. Therefore, the state's employees did not act with reckless, willful, and wanton conduct with respect to their handling of Barajas's custody.

The record contains evidence of the Department's efforts to contact, evaluate, and rehabilitate Barajas. These efforts simply were hindered by Barajas's disappearance. Nor can the Department's failure to act with greater dispatch be considered reckless, willful, or wanton because nothing in Barajas's antecedent behavior or present comportment presaged the vicious exploits committed against Harris such that a reasonable person could foresee the need to restrain Barajas from society. The most drastic prediction recorded was that Barajas might be an above average sexual risk to his female peers, which Harris was not.

Harris argues that the Department failed to comply with the statutory provisions of the Youth Rehabilitation Act ("YRA") by not maintaining possession and control of

exception to liability found in the tort claims act shields the alleged misconduct from liability; and, if no exception applies, whether the merits of the claim as presented for consideration on the motion for summary judgment entitle the moving party to dismissal.

2. I.C. 6–904C(2) defines "reckless, willful, and wanton" as conduct which:
 [I]s present only when a person intentionally and knowingly does or fails to do an act creating unreasonable risk of harm to another, and which involves a high degree of probability that such harm will result.

Barajas. Under the court order and the Youth Rehabilitation Act the Department had alternative placement options.[3] It could place Barajas out of the home or *treat* Barajas out of the home.[4] The caseworker, Mr. Hinton, chose to do the latter. Moreover, "out of home" is not equivalent to secure detention. It could be foster care, a group youth home, or Job Corps, none of which would have prevented Barajas's opportunity for crime. However, the YRA provisions would not have authorized long-term secure detention because no felony had been committed. In addition, the primary purpose of the YRA is rehabilitation in the least restrictive setting necessary.[5] There was no finding by the magistrate or Barajas's evaluators that Barajas posed a danger to the community requiring isolation. In short, the Department's conduct did not rise to the level of creating an unreasonable risk of harm to the public, and therefore was not reckless, willful, and wanton.

## II.

### QUALIFICATION FOR IMMUNITY UNDER THE TERMS OF I.C. 6–904A(2)

The trial court properly interpreted I.C. § 16–1802(n) to find that the Department had custody of Barajas within the meaning of I.C. § 6–904A(2) at the moment it was declared so by the magistrate. Appellant apparently confuses the issue by attempting to draw a distinction between physical and legal custody. A statute is to be construed pursuant to its plain, obvious, and rational meaning. *Sherwood v. Carter*, 119 Idaho 246, 254, 805 P.2d 452, 460 (1991); *Sweeney v. Otter*, 119 Idaho 135, 138, 804 P.2d 308, 311 (1990). Accordingly, it is clear that I.C. § 16–1802(n) does not anticipate physical possession and control as a prerequisite to custody. The definition of legal custody confers physical obligations rather than germinates from them. Moreover, it is also clear from the language of I.C. § 6–904A that the legislature intended the protections of I.C. § 6–904A to potentially cloak any type of court-imposed custodial relationship between the state and a tortfeasor, such as the type of situation at bar. This purpose would be frustrated if appellant's narrow construction of "custody" were accepted. Therefore, we find that, upon his release from the detention center, Barajas was still under the legal custody of the state although released to the possession of his parents, and that the state thereby qualifies for the immunity afforded by I.C. § 6–904A.

3. When a child has been committed to the board, the board is to "examine and study him and investigate all the pertinent circumstances of his life and the antecedents of the acts for which he was committed". I.C. § 16–1822. In addition, "[t]he board shall make periodic reexamination of all persons committed to it for the purpose of determining whether existing orders and dispositions in individual cases should be modified or continued in force...." I.C. § 16–1823. Moreover, the:

> Case management staff shall develop treatment programs for each youth offender in the community, provide appropriate services and monitor individual progress. Progress reports shall be filed at least every three (3) months with the committing court for each youth offender committed to the department for out-of-home placement....

I.C. § 16–1834. The record reflects that the Department satisfied these mandates.

4. It is not mandatory that the department keep the child physically confined or even constantly monitored. Rather:

> When a person has been committed to the board it may: (a) Permit him his liberty under supervision and upon such conditions as it believes conducive to satisfactory conduct; (b) Order his confinement under such conditions as it believes best designed for the interest of the individual and protection of the public; ... (e) Discharge him from control when it is satisfied that such discharge is consistent with the protection of the public....

I.C. § 16–1833 (1963).

5. I.C. § 16–1801 provides that:

> [The underlying policy of this act is] to divert the child into a program of treatment, counseling, rehabilitation and restitution prior to court action where the interests of the child and the community would best be served by such diversion; and to consider the needs and best interests of the child as well as the need for protection of the community and to achieve the foregoing purposes in the least restrictive setting necessary, with a preference at all times for the family home and the integration of parental responsibility for the child into the treatment and counseling program.

I.C. § 16–1801.

## III.

### CONSTITUTIONALITY OF I.C.
### § 6–904A & § 6–904C

 We reject appellant's contention that I.C. § 6–904A denies her due process and equal protection of the laws. When analyzing a constitutional issue, a threshold issue that must be resolved by the court is the proper standard of review to apply, whether it be strict scrutiny, means-focus, or rational basis. Strict scrutiny is inapplicable here because no fundamental right or suspect classification is involved. Neither is the means-focus test applicable, for there is no patent indication of a lack of relationship between the classification and the declared purpose of the statute. *See Jones v. State Bd. of Medicine*, 97 Idaho 859, 871, 555 P.2d 399, 411 (1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). The legislative purpose underlying the statute was to reinstate immunities which existed prior to *Sterling v. Bloom*, 111 Idaho 211, 723 P.2d 755 (1986), and to separate existing sections into three different sections. The rational basis test is generally appropriate to use when reviewing statutes impacting on social or economic areas. *See Johnson v. Sunshine Mining Co.*, 106 Idaho 866, 869, 684 P.2d 268, 271 (1984); *Leliefeld v. Johnson*, 104 Idaho 357, 373–75, 659 P.2d 111, 127–29 (1983).

 Under the rational basis test, a statute is constitutional unless it is not rationally related to a legitimate governmental end. Because the law of sovereign immunity can be traced to statutory origins, I.C. § 6–904A cannot be construed as unconstitutional simply because it reflects the legislature's choice to reverse the liberal trend embodied in *Sterling*. In an earlier case this Court rejected a similar argument, holding that although the courts are free to modify or abrogate governmental immunity, the legislature has the constitutional authority to reimpose it. *Haeg v. City of Pocatello*, 98 Idaho 315, 317, 563 P.2d 39, 41 (1977). *See also Olsen v. J.A. Freeman Co.*, 117 Idaho 706, 717, 791 P.2d 1285, 1296 (1990); *Jones v. State Bd. of Medicine*, 97 Idaho 859, 555 P.2d 399

(1976). In this instance, the legislature has limited liability after finding that the courts were taking it too far in the other direction. The legislature is not acting beyond the common law purpose of the statute, *i.e.* to define the scope of sovereign immunity. The legislature is merely attempting to protect the fiscal integrity of the state. This Court has previously determined such protection to be a legitimate governmental objective. *See Leliefeld*, 104 Idaho at 374, 659 P.2d at 128. Moreover, the exception provided in I.C. § 6–904A(2) furthers this purpose. The statute protects against ordinary negligence claims which would significantly impair effective governmental process, yet allows fair compensation for egregious wrongs. It reflects a deliberately chosen policy choice to overrule *Sterling*, as Judge Wood aptly noted.

No costs on appeal.

BAKES, C.J., and TROUT, J., concur.

BISTLINE, Justice, concurring and dissenting separately, and concurring in full in the opinion of Justice JOHNSON:

Although I am in agreement with the content of both paragraphs of Justice Johnson's opinion, because no other member of the Court has written to flesh out the facts of this controversy, I will endeavor to do so. The public has a right to know.

### PROLOGUE

Idaho Code § 6–904, enacted in 1988, spells out seven (7) differing sets of circumstances relative to a governmental entity and its employees being named as defendants in a filed tort claim based on allegations of negligence, but specifically provides for government immunity as to certain acts or conduct:

**Exceptions to governmental liability.**—A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:

1. Arises out of any act or omission of an employee of the governmental entity exercising ordinary care, in reliance upon or the execution or performance of a statutory or regulatory function, whether or not the statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused.

2. Arises out of the imposition or establishment of a quarantine by a governmental entity, whether such quarantine relates to persons or property.

3. Arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

4. Arises out of the activities of the Idaho national guard when engaged in training or duty under sections 316, 502, 503, 504, 505 or 709, title 32, United States code.

5. Arises out of the activities of the Idaho national guard when engaged in combatant activities during a time of war.

6. Arises out of or results from riots, unlawful assemblies, public demonstrations, mob violence or civil disturbances.

7. Arises out of a plan or design for construction or improvement to the highways, roads, streets, bridges, or other public property where such plan or design is prepared in substantial conformance with engineering or design standards in effect at the time of preparation of the plan or design or approved in advance of the construction by the legislative body of the governmental entity or by some other body or administrative agency, exercising discretion by authority to give such approval.

Idaho Code § 6–904(A) of the same 1988 legislative enactment expands upon the opening sentence above, by adding the following conditions: "without malice or criminal intent and without reckless, willful and wanton conduct as defined in section 6–904C, Idaho Code." Idaho Code § 6–904C(2) spells out the legislature's definition for ascertaining the presence of reckless, willful and wanton conduct:

'Reckless, willful and wanton conduct' is present only when a person intentionally and knowingly does or fails to do an act creating unreasonable risk of harm to another, and which involves a high degree of probability that such harm will result.

## PART I: THE FACTS

At the outset it need be understood and remembered that the record is devoid of evidence that any employee of the state of Idaho had any involvement in the brutal assault administered to Ester Harris in her home. It does involve conduct on the part of the Department and some of its employees which raises a question of fact as to whether such conduct was reckless, willful, and wanton as defined by the legislature.

Almost *four months* before the assault on Harris, Barajas was brought into juvenile court, having been charged with petit larceny. Evidence relating to the juvenile's past history was assembled by Department personnel trained in evaluating and dealing with delinquency in order to aid the juvenile court in fashioning an appropriate disposition. After absorbing the then-recent history of the juvenile and resorting to their collective educational and experiential backgrounds, the Department presented a prognosis as to what might be expected of the sixteen year old Barajas in the future.

Richard Moulton of Court and Clinical Services, Idaho Falls, Idaho, testified at the December 21, 1988, hearing conducted by Judge McClure. The transcript of testimony is as follows:

PROCEEDINGS [at hearing on December 21, 1988]

THE COURT: Adrian Barajas appears before the Court for disposition on a charge of petit theft. The Social Summary has been prepared and is before the Court.

. . . .

MR. MOULTON: Your Honor, our motion to Adrian's situation causes us some

degree of concern relative to what is recommended before the Court, not only his past propensity to get into difficulties as well as the dynamics of the family situation.

The Court is aware [of] that on his prior record. We have worked with him previously, both he and his family, because of the difficulties between Monico and Adrian. We worked with them it looks like about 1984 through '86.

As I recall, and correct me, Adrian, if I am wrong, during the period of time you were on probation, you were only on probation a few months before you left and went to Arizona.[6]

Isn't that correct?

ADRIAN BARAJAS: Yes.

MR. MOULTON: *That was without our knowledge or consent* and I think there were some problems which precipitated a family meeting. What it suggests to us was that community-based probation is going to be somewhat difficult due to the fact that we haven't gotten the degree of cooperation that we had hoped for in the past.

There are also additional problems within Adrian's background which indicate to us *he is in need of some rather sophisticated psychotherapy.* He has been molested by an adult in his past and those things haven't yet been fully resolved. We mention there too some of his behavior presently in terms of delinquent acts which suggest that he *is rather sophisticated* in what it is he is doing *in terms of delinquency.* What I mean by that is the petit theft was done in concert with two other female juveniles and that was as if Adrian was using them to assist him in the theft of the video cartridges. In fact he gave the cartridges to them and they carried them out of the store for him.

Based on our evaluation of him and the situation, Your Honor, we have recommended to the Court that *he be committed to the Department of Health & Welfare.*

I am also recommending to the Court to reinforce in Adrian's mind that these things are not to be done and when one does criminal acts that he serve some time in jail. I am recommending four days. I believe I stated from this afternoon until the following Sunday at 6:00 p.m. I might change that a just little bit and allow the Department [to] perhaps go up and pick him up on Monday or whenever they wanted to bring him down for evaluation. Perhaps we could let the Department respond to that.

(Emphasis added.)

Also placed in evidence at the December 21 hearing was the report of Kerry Denney, staff psychologist for the Department of Health and Welfare. Denney had earlier performed an exhaustive, ten page psychological evaluation of Barajas relative to the prospect of Barajas being committed to the custody of the Department:

*DIAGNOSTIC SUMMARY*

Adrian appears to have reacted to the trauma of being sexually abused by trying to prove that he is not a homosexual. *This insecure defensive attitude about his manliness appears to have caused him to become physically abusive to peers to show everyone he is no sissy or homosexual.* The physical abuse he received from his natural father, and his father's murder may have also added to his aggressive anxiety. Adrian appears to deny and repress much anger and fear. *He appears to have an anti-social attitude and habit of physically attacking others. He has a hot temper. His persistent anger causes him to react violently to minimal provocation.*

Adrian seems to feel he has little control over his future, and that he is a product of his environment. He sees no options to those chosen by his family. Neither his attitudes or behaviors seem likely to change *unless he is removed from his environment.*

He could greatly benefit from vocational and educational training.

---

**6.** More directly stated, Adrian had simply absconded.

*RECOMMENDATIONS:*

Individual insight counseling may be helpful if it could occur on a somewhat informal basis. He will likely reject the idea that he is emotionally ill due to events of the past. He sees no connection between his overall emotions and attitudes and his habit of fighting. Understanding underlying emotions and motivations could help this youth become more in control of his behaviors. *This youth needs guidance to help him find new socially acceptable behaviors to problems he encounters. He appears to have a number of feelings and issues to resolve concerning his sexuality. He may be an above average risk to sexual abuse of his female peers. Appropriate sexual behavior needs to be discussed with Adrian. Considering the multiple family problems with sexual abuse, this is likely a confusing area. He may not have clear values.*

Placement at Job Corp to complete his G.E.D. and train in auto body repair appears to be most appropriate at this time. Without this training, future financial problems seem inevitable. Adrian may also need assistance applying for federal student aid to attend training locally if he is not accepted at Job Corp. This training may give him hope of breaking out of the recurring problems experienced within his family.

(Emphasis added.)

After considering the evidence before it, the court issued a written order:

IT IS FURTHER ORDERED AND DECREED AS FOLLOWS: The Court having considered the findings in a Social Study prepared for the Court, and having found that reasonable efforts have been taken to prevent [sic, preclude, avoid] removal of said child from the home, *and it appearing that continued residence in the home would not be in the best interest of the child*; IT IS HEREBY ORDERED *said child be committed to the Idaho Department of Health and Welfare for out of home placement.* Contributions by parents for support of said child, in a reasonable amount, shall be determined by the Bureau of Child Support Enforcement. Said juvenile is further ordered to serve 4 days detention. Restitution to victim in the amount of $151.65 to victim within 30 days.

(Emphasis added.)

Judge McClure's order to the Department was not fulfilled as directed. The Department did transport him from Idaho Falls to St. Anthony where he was incarcerated for four days, after which it is not clear whether the Department returned him to his parents or whether Barajas returned to the family residence of his own volition on being released from confinement.

The court's order contained the clear requirement of "out of home" placement. The Department of Health and Welfare took upon itself the liberty of ignoring the court's order. In a form document with blanks for appropriate names to be filled in, the Department, the judicially appointed custodian of Barajas, returned him into the exact environment from which the court had just ordered him removed:

Pursuant to authority contained in Chapter 18, Title 16, Idaho Code, as amended, and authority vested in the undersigned by the Director of the Department of Health and Welfare, and upon the decree of the Honorable Mildred R. McClure, District Judge or Magistrate of the District Court of Magistrate Division thereof, of Bonneville County, Idaho, dated the 22nd day of December, 1988, *whereby Alban Adrian Barajas, a child under 18 years of age, was duly committed to the Department of Health and Welfare of the State of Idaho, the* **undersigned designates the disposition of said child to be**:

**With his mother and stepfather: Elinoz [sic, Elinor] and Jose Escalera,** P.O. Box 51671, Idaho Falls, ID 83403.

DONE AND DATED in Idaho Falls, Idaho, this 25th day of December, 1988.

(Emphasis added.) The document is signed by the Department's regional service manager, whose signature is illegible. That order in and of itself is significant evidence of reckless, willful, and wanton conduct. It directly contravenes the express order of the court, which vested custody in the De-

partment under clear conditions that Barajas was *not* to have *in-home* care and treatment. The Department was well aware that Barajas' stepfather and mother had no control over Barajas as evidenced by his juvenile record and his earlier running away to Arizona when he was only a fourteen year old probationer living in the family home.

What happened after his placement back at home was readily predictable. As the majority admits: "The Department lost touch with Barajas and unsuccessfully attempted to regain contact. Barajas ... dropped out of school, his family residence [was] abandoned, and his mother ... quit her job." At 297, 847 P.2d at 1158.

Because of the Department's reckless, willful, and wanton actions, Barajas was wholly on the loose at the time of the assault on Ester Harris. Although the Department had been awarded physical custody of him for the very purpose of attending to his rehabilitation, it clearly forsook custodial trust of Barajas, an unconscionable dereliction of duty. Not only would the betrayal of that trust result in the assault and near murder of Ester Harris, but, bluntly, it was the end of the road for Adrian Barajas, who is no longer in the custody of the Department of Health and Welfare for purpose of rehabilitation which never took place, but rather committed to another state agency, the Board of Corrections.

Worse yet, the Department did precious little to locate and apprehend Barajas. Only by chance was he ever apprehended, but not until *after* he had vented his rage and frustrations on an unwarned and unsuspecting Ester Harris. Moreover, no action by the Department brought about his apprehension. The Department expended little meaningful effort in that direction.

Had the Department taken productive efforts, it is more than likely that Barajas would have been apprehended long before the assault on Harris occurred. One need only turn to the affidavit of Terry Ray Foster, found in the appeal record at p. 83, to ascertain that the Department's inactions, in not giving any general warning

that Barajas was dangerous and on the loose, precluded the apprehension of Barajas on the morning of the very day Ester Harris was assaulted. This affidavit, although not executed until June 7, 1991 (in preparing the Harris case for trial), was applicable to events taking place in Bonneville County on April 8, 1989, and April 9, 1989, being respectively the date on which Barajas *could have been taken into custody,* and the following day when he was taken into custody—only after the terrible assault on Harris.

The sworn affidavit of Terry Ray Foster states in relevant part:

1. That I am a Deputy Sheriff employed by the Jefferson County Sheriff's Department and I make this Affidavit on personal knowledge and business records maintained in the ordinary course of business by the Jefferson County Sheriff's Department.

2. That on the morning of April 8, 1989, in my capacity as Patrol Deputy with the Jefferson County Sheriff's Department, I *stopped a 1979 tan Mercury Zephyr which was driven by Adrian Barajas.*

3. A true and correct copy of the incident report which I completed relating to this stop is attached hereto as Exhibit "A."

4. At the time of this stop, I never knew that Adrian Barajas was committed to the care and custody of the Department of Health & Welfare. *If I had known that Adrian Barajas had been committed to the care and custody of the Idaho State Department of Health & Welfare,* and if there had been an Order of Detention entered and *if I had known* there had been an Order of Detention, *I would have detained* him on the morning of April 8, 1989, and notified the Idaho State Department of Health & Welfare.

5. On April 9, 1989, I received a request from the Idaho Falls Police Department relating to Adrian Barajas and I stopped him at his residence at 119 North 3400 East, Lewisville, and detained him for the Idaho Falls Police Department.

My report of this stop is also included in the incident report attached hereto as Exhibit "A."

. . . .

### EXHIBIT A

On 4-8-89 at approximately 10:55 a.m. I was notified of an assault that had just occurred at Ball Bros. Warehouse in Lewisville, on George Lee Jr. Mr. Lee stated that 8 Hispanic males (5 at least of which were in a vehicle I stopped later), entered Mr. Lee's place of employment, Ball Brothers Produce in Lewisville, and threatened Mr. Lee with physical violence. . . . He stated that he only knew 2 of the individuals, and only one person's residence, which was in the Grant area. Myself and Deputy Roger Poole responded directly to the Grant area in an attempt to locate the suspects. We located the suspects southbound on 3400 East (Lewisville Hiway), at approximately 170 North, and initiated a stop to identify those involved that may have been in the vehicle. . . . The vehicle was a 1979 Mercury, Zephyr, registered to Roberto Martinez, who lives at 520 North Ridge # 26, Idaho Falls. It had license place 8/B 58837 and was light tan, with brown in color. A shorter (5'00" to 5'2") male Hispanic, he was wearing a green sleeveless t-shirt, and when I asked him to identify himself by producing a driver's license, he stated he did not have one. I asked him for any other identification, and he stated he didn't have any. The suspects reported involved in the assault, had stated that they were armed with firearms in the vehicle, to Mr. Lee, so I asked the driver to step out of the vehicle, and I did a pat search on him, finding a brown leather, worn, tri-fold wallet in his right front pocket. I asked the driver to remove his wallet, and remove its contents and place all of it on the trunk of his car. He did so, and the wallet contained a well worn vynal [sic, vinyl] photograph holder, with 3 or 4 photographs, several business like cards and scrapes [sic] of paper, and a tan library card with a signature that appeared to read Albion Barajas. I asked

the driver if that was his name, indicating the library card and he said yes, and I asked him to spell it, and he spelled it Adrian Barajas, and gave me the above address and D.O.B. I then asked the other occupants to step out of the vehicle and produce identification, and also explained why I had stopped them, and wanted I.D. Only one other occupant, Monico Barajas, had a driver's license, and after getting names, addresses and dates of birth, I asked them if I could look in their car and they agreed. They opened the doors, jockey box, and trunk, and also leaned the seats forward for me, but I was unable to locate any weapon from my vantage point, I did not enter the vehicle. I then warned them against any further acts of aggression aimed toward Mr. Lee, and released them. . . . I have taken no further action on that matter at this time.

On 4-9-89 at approximately 2030 hrs. NCIC/ILETS contacted this officer concerning my stop on the above named vehicle. Apparently this vehicle was reported stolen to Idaho Falls Police Department (I.F.P.D.), at approximately 1940 on 4-8-89, and reported to have been stolen around 1000. I initiated my stop of this vehicle at 1108. I.F.P.D., Officer Lynn Case, contacted me at the office shortly after NICI/ILETS contacted us. He requested any additional information I had concerning my stop, and when I reported the events around my stop, names and addresses of my suspects, he stated that they had another case, a rape that had occurred that evening (4-9-89), in which a wallet matching the description of Adrian's wallet was found at the scene. He requested that I go to Adrian's residence, reported to me as 119 North 3400 East, and attempt to locate the vehicle, and if possible, identify the occupants of the residence, particularly Adrian or his brother Monico, and if possible recover the vehicle. Myself and Officer Sam Dye of this Department went to the residence after I notified Lieutenant Jeff Poole also of this Department, but we were not able to locate the

vehicle. I spoke with Elinor Escalera at the residence who advised me that Monico and Adrian were her sons and that they had gone to Idaho Falls that evening, driving a 1978 Ford Fairmont, brown in color and bearing the plate # 8/B 50697. We left the residence and went to the Grant store to wait. At approximately 2220 the suspects passed our location northbound on 3400 East, driving the Fairmont, and I initiated a stop with officer Dye as back up. I identified the occupants, 3 of 5, as being 3 of the individuals I stopped on 4–8–89 in the stolen vehicle. 2 of the other occupants were small children (approximately 10 y.o.a.) I did not recognize. I had dispatch notify I.F.P.D. that I had their suspects detained (3 of them) and they advised they would have 2 officers in route to my location. I observed blood on Adrian's hands, arms, shoulder and pants. He was wearing a black sleeveless t-shirt, a pair of stonewash looking jeans, however the jeans were baggie and not a Levi style jean, and he had suspenders but they were not done up. I.F.P.D., uniformed officer Vic Baldwin and plainclothes officer Mark McBride arrived at the scene, and with consent of Elinor, searched the Fairmont and then took the 3 juveniles to Idaho Falls for questioning. I have taken no further action at this time.

(Emphasis added.)

## PART II: RECKLESS, WILLFUL, AND WANTON CONDUCT

The district court in considering the motion for summary judgment had before it the 1988 statute which was then recently enacted, namely, I.C. § 6–904(A)(2).[7] In dealing with that statute, the district court wrote as pertinent to our review:

> This court must determine the statute's application by applying the undisputed facts to the language of the statute. In that regard, it is undisputed that the *State's employees were, at all times material to this action, acting within the course and scope of their employment relative to the court ordered custody of Barajas.* In this court's view, it is also undisputed *that the State's employees were, at all times, acting without malice or criminal intent.* There is *no evidence* in the record to indicate *that the State's employees intentionally and knowingly did or failed to do any act which created an unreasonable risk of harm to Harris; in particular, there is no evidence whatsoever to suggest that such employees did or failed to do any act which involved a high degree of probability that the kind of harm which Harris suffered would result therefrom.* Therefore, the State's employees did not act with reckless, willful and wanton conduct with respect to their handling of Barajas' custody. The evidence is also clear, beyond dispute, that Harris' claim arises out of injury to her person.

At this point it becomes necessary to differ from the views of the district court. The written decision, which was predicated on the above bare-bones analysis of I.C. § 6–904A(2), then concluded: "Therefore, the State's employees did not act with reckless, willful and wanton conduct with respect to their handling of Barajas' custo-

---

7. Paraphrasing Idaho Code § 6–904(A)(2): A governmental agency and its employees, while acting within the course and scope of their employment, and without malice or criminal intent and without reckless, wilful and wanton conduct as defined in § 6–904(C)(2) ("[r]eckless, willful and wanton conduct" is present only when a person intentionally and knowingly does or fails to do an act, thus creating unreasonable risk of harm to another, and which involves a high degree of probability that such harm will result) shall not be liable for any claim which arises out of injury to a person or property done by a person who is on probation or parole or any work release program, or by or to a person receiving services from a mental health center, hospital or similar facility.

It is manifestly clear from the record which we review that Barajas was on neither probation nor parole, nor any work release program, and that neither Barajas nor Ester Harris were being serviced by a mental health center, hospital or similar facility. Barajas had been committed to the Department of Health and Welfare solely for purpose of relocating him in an environment favorable to the rehabilitation program in which the Department's experienced personnel wanted to place him.

dy." That view is not supportable in light of the evidence in the record which supports the conclusion that the Department's activities culminated in letting loose on a wholly unwarned and unsuspecting populace in southeastern Idaho a juvenile delinquent *known* to have dangerous proclivities. Various levels of Health and Welfare personnel had been involved in evaluating the sixteen year old juvenile. In short, the juvenile's history of anti-social behavior more than adequately cautioned the Department to be exceedingly alert in keeping a tight rein on his activities. Clearly, he was a youngster without a meaningful family or home life and hence a candidate for immediate placement in a supervised rehabilitation program. His four days of confinement at the St. Anthony facility, which Department personnel requested and obtained from Judge McClure in the form of a court order, should have been only the prelude to commencing the Department's intended rehabilitation of Barajas. In that manner *his best interests would have been served.* The Department had been given physical custody of him for the very purpose of rehabilitation. For some unknown reason (and none can be gleaned from the record), the Department placed Barajas forthwith back into the same environment from which he had just been removed by order of Judge McClure, which was done at the request of the Department. Such unexplained and patently irrational conduct is readily characterized as reckless, willful, and wanton, sufficiently so that a prima facie case was sufficiently made to withstand the Department's motion for a summary judgment dismissing the action. Clearly there should have been a trial. Where a demand had been made for a jury trial, the trial court erred in not impaneling a jury and leaving to it the reaching of a verdict as to the Department's liability, if any, and then the amount of damages to which Ester Harris is entitled.

Further, there very well might be nine or more jurors who would conclude that the Department's failure to take any measures to warn the people of that area, including Ester Harris, that Adrian Barajas was a menace among them, was reckless, willful and wanton conduct on the part of the Department. The dereliction in duty attributable to the defendants flowed from a pattern of complete indifference that a jury could see as rising to the level of reckless, willful and wanton conduct chargeable to the Department.

## PART III: THE WRITTEN ORDER

An issue raised tangentially by the Department, and one on which it then placed great reliance, is a supposed discrepancy between the disposition which Judge McClure verbalized at the hearing on December 21, and the content of the order which she issued on the following day. From the Department's brief:

> The next day, December 22, 1988, Judge McClure entered what appears to be a *form decree* purporting to document her disposition ordered at the hearing for the court file. Exhibit 1. It accurately sets forth the four days detention, restitution, and parents' obligation of support ordered, but also states:
>
>> IT IS HEREBY ORDERED said child shall be committed to the Idaho Department of Health and Welfare *for out of home placement.* (emphasis supplied) (Exhibit 1)
>
> Thus the form decree does not incorporate Judge McClure's *complete* ordered disposition of 'out of home treatment *or* out of home placement *and/or* treatment,' as *stated* at the hearing and consistent with Moulton's recommendations she adopted.

(Emphasis added).[8] The Department, having laid out the foregoing, drops whatever it had in mind relative thereto and instead digresses to delineating its sporadic reports to Judge McClure's court as to the Department's unproductive activities relative to *locating* the missing Barajas.

---

8. It is beyond cavil that the court's written order supersedes what the court verbalized on the previous day.

The Department's brief does not contend that a verbal delivery of the Court's disposition takes precedent over the signed, written order entered on the following day (December 22, 1988). Nor does it appear that any concern in that regard was presented to Judge McClure for clarification, or that it was thereafter presented to the district court for resolution. All that it accomplishes is establishing that Judge McClure on overnight reflection saw fit to remain with her first conclusion that Adrian would not be amenable to intended rehabilitation until he was removed from his then present environment to a setting more favorable to the intended goal of rehabilitation.

## PART IV: THE FORESEEABLE CLASS OF RAPE VICTIMS

Although I do not disagree that foreseeability ought to be narrowly drawn, there are statements in the majority opinion which raise considerable concern, most notable of which is: "The specific harm, i.e., sexual violence toward the *particular class of plaintiff* must be manifest or ostensible." At 299, 847 P.2d at 1160 (emphasis supplied.) A later statement adds that "[t]he most drastic prediction recorded was that Barajas might be an above average sexual risk to his female peers, which Harris was not." Reasonable minds could readily conclude that the Department of Health and Welfare acted with reckless, willful and wanton conduct in turning Barajas loose in the community wherein his delinquent conduct had been documented at the time the order of commitment was entered. Although Ester Harris was his victim, the class put at risk of rape or brutality by the release of Barajas was the entire female population. In such a scenario, it matters little, if any, how old or young the victim is, other than to the extent that a fact-finding judge or jury might readily and properly be influenced not only by the intensity of the criminal act but also by the tender years of a victim, or by the victim's far advanced age and attendant debility, as was the case here.

The majority definition of the foreseeable class of plaintiff under the facts is not only too narrow but is unnecessary to the holding, in view of the majority conclusion that the actual risk of harm to any woman was evaluated as fairly low. If the appropriate class of plaintiff need be mentioned at all, perhaps it should be redrawn to include all women, as suggested in the proceeding paragraph.

It is readily agreed that the Department's employees did nothing which created any foreseeable probability that it would be Ester Harris who was singled out to suffer the savage, disabling and in fact, life threatening attack in her own home on April 9, 1989, administered by Adrian Barajas. As is readily observed by a perusal of the record, there is not a bare scintilla of any evidence that either the elderly Mrs. Harris and Barajas had ever even heard of each other. There was, however, a readily foreseeable probability that one or more persons in community would suffer mightily at the hands of Adrian Barajas when, as earlier predicted by knowledgeable Department personnel, a time would arrive when Barajas in attempting to prove his "manliness" would be a menace to "females"— not necessarily only to his female peers, who in a public setting individually or collectively might best him, but to any defenseless elderly woman alone in her own home.

## PART V: CONCLUSION

The dereliction in duty attributable to the defendants flowed from a pattern of complete indifference which a rational trier of fact could find to rise to the level of reckless, willful and wanton conduct chargeable to the Department. Such a finding could be predicated on two facts: one, the Department disobeyed an express order of the court, and two, it made no meaningful efforts to either recapture Barajas or warn the public that he was at large.

Had he robbed a bank and been captured on film by a video surveillance camera, we would be seeing a totally different scenario. We all know that to be so simply from reading and listening to televised and print-

ed news reports that inform the public of the suspects who are wanted by the authorities; those reports are ordinarily accompanied by photographs furnished by either the law enforcement people, concerned citizens, or the banks. Yet the Department failed to use the available media services and thus avail itself of a ready means for apprehending a sixteen year old youth who was around and about.

The Department of Health and Welfare for the reasons herein should be caused to defend its actions and inactions in a public forum, whereat it might find a jury which would not hold it liable and accountable in damages to Ester Harris. Exactly as stated by Justice Johnson, she is entitled to a jury trial to decide whether the terrible harm which befell her was attributable in whole or in part to the Department's actions. It will be a sad day for Idaho justice if this controversy is not brought to its conclusion at a jury trial. This is not to say that Judge Wood would not be a fair finder of the fact, because he is known to be just that. It is to say that where a jury trial has been demanded, as here, it is the American way to put the issue before a jury. In that manner, the public confidence in the judicial system is bolstered rather than weakened.

JOHNSON, Justice, concurring and dissenting.

I concur in parts II and III of the Court's opinion, but respectfully dissent from part I.

In my view, *Jacobsen v. City of Rathdrum*, 115 Idaho 266, 766 P.2d 736 (1988), and *G & M Farms v. Funk Irrigation Co.*, 119 Idaho 514, 808 P.2d 851 (1991), dictate that we vacate the trial court's summary judgment. As I read the record, applying the standards in *Jacobsen* and *G & M Farms*, we should hold that there is a genuine issue of material fact whether the Department was reckless, willful, and wanton in its supervision of Barajas. I believe the Court's opinion incorrectly requires that Harris meet an elevated standard of proof to avoid summary judgment.

In my view, in construing the evidence in the record most favorably to Harris, and giving Harris the benefit of all favorable inferences which may be drawn therefrom, there is evidence to support each element of the prima facie case necessary for the theory of reckless, willful, and wanton conduct. Cf. *G & M Farms*, 119 Idaho at 526, 808 P.2d at 526; *Jacobsen*, 115 Idaho at 272, 766 P.2d at 742.