963 P.2d 357

**Walter LUCAS and Deborah Lucas, husband and wife, Plaintiffs–Appellants,**

v.

**STATE FARM FIRE AND CASUALTY COMPANY, a corporation; State Farm Mutual Automobile Insurance Company, a corporation; An Association Which Includes State Farm Fire And Casualty Company, a corporation, and State Farm Mutual Automobile Insurance Company, a corporation, Defendants–Respondents.**

No. 23416.

Supreme Court of Idaho,
Boise, December 1997 Term.

May 28, 1998.

Rehearing Denied Sept. 28, 1998.

Harris & Sutton, Boise, for Appellants. Jim C. Harris argued.

Elam & Burke, P.A., Boise, for Respondents. Bobbi K. Dominick argued.

WALTERS, Justice.

Following an auto accident involving Walter Lucas, Walter and Deborah Lucas (Lucas) filed an action against their insurance company, State Farm, seeking damages for bad faith, breach of contract and fraud. On State Farm's motion for partial summary judgment, the district court ruled that because there was conflicting medical evidence, Lucas's claim was "fairly debatable," and thus granted summary judgment to State Farm. We vacate the judgment and remand the case for further proceedings.

## I.

### FACTS AND PROCEDURAL BACKGROUND

On June 19, 1992, State Farm Fire and Casualty Company (State Farm) issued a binder to Lucas for a policy of automobile insurance. The policy provided "medical payments coverage" (MPC) for reasonable medical expenses for bodily injury caused by an accident, with a limit of $50,000. The policy further provided, "[w]e (State Farm) will pay reasonable medical expenses, for *bodily injury* caused by accident, for services furnished within three years of the date of the accident." (Original italicized.)

On July 6, 1992, Walter Lucas was involved in an automobile accident with another driver who was insured by American Na-

tional Property and Casualty Insurance Company of Missouri (ANPAC). The next day on July 7, 1992, Lucas reported the accident to State Farm, and Barbara J. Dion, a claim representative for State Farm's sister company, State Farm Mutual Automobile Company, was assigned to the claim.

At the time of the accident, Lucas suffered from back and neck pain, but was not taken to the hospital by the paramedics. However, later that day, Lucas went to St. Alphonsus Regional Medical Center, where he was seen in the emergency room by Dr. Glen Bothwell. After examining Lucas, obtaining a history and having cervical and chest x-rays taken, Dr. Bothwell diagnosed Lucas with "acute cervical spine strain" but noted that the cervical spine films appeared normal. At this same visit, the x-ray report noted a preexisting arthritic condition in Lucas's cervical spine.

Four days later, on July 10, 1992, Lucas visited his family physician, Dr. Douglas H. Orchard, for follow up treatment of his injuries. After cervical x-rays, Dr. Orchard diagnosed Lucas with a slight narrowing of the C5–6 disk space with minimal retrolisthesis. On July 31, 1992, Lucas was seen by Dr. Brenda Adams who diagnosed Lucas with a "cervical strain with some ulnar nerve radiculopathy."

As Lucas's neck pain persisted, Lucas was referred by Dr. Orchard to Dr. Michael O'Brien, a neurologist, who saw Lucas initially on September 21, 1992, and continued to treat Lucas until the end of October. Dr. O'Brien diagnosed Lucas with cervical strain, tardy ulnar palsy, scoliosis and the absence of a platysmas muscle in the neck area. Dr. O'Brien attributed the cervical strain and the tardy ulnar palsy to the accident, and stated that the scoliosis and absence of a platysmas muscle, which were congenital, made Lucas more vulnerable to be injured.

Lucas was not satisfied with Dr. O'Brien, so State Farm provided another neurologist for Lucas to see, Dr. Robert Burton, who examined Lucas on November 17, 1992. Dr. Burton found that Lucas's platysmas muscle was present, and that the scoliosis was only minor. Dr. Burton found that:

I find no evidence on examination for herniated cervical disc and the mild degenerative changes noted on his cervical spine X-ray are indeed mild and do not represent an abnormality of that [sic] one could relate to trauma. These were pre-existing. His pain is primarily of the musculoligamentous origin.

After completing nearly a month of physical therapy, Lucas was referred to another neurologist, Dr. Allen C. Han, whom Lucas visited on January 3, 1993. After an MRI, Han diagnosed Lucas with "degenerative changes with potentially significant neural foraminal stenosis on the left at C5–6 and on the right at C6–7. Both of these levels appear to have advanced since the plain film study of 6 July 1992." Lucas was then examined by Dr. Charles Smith, another neurosurgeon, on February 25, 1993. After a CT scan, Dr. Smith diagnosed Lucas with mild osteoarthritis and noted that there is "associated mild spinal stenosis at the C5–6 and C6–7 levels." In response to a letter from Dion asking about the cause of Lucas's condition, Dr. Smith stated:

The cervical flexion/extension injury derives per history given me from the vehicular accident of July, 1992. Mr. Lucas' neck pain is apt to continue for quite some period of time regardless of further therapy—further therapy should reasonably be symptomatic. The pain radiating into the arm is felt to be radicular, even in the absence of electrodiagnostic corroboration. This, per my understanding of the circumstances, was triggered by the accident; however, Mr. Lucas was certainly more vulnerable on the basis of his foraminal stenosis which very likely proceeded [sic] the vehicular accident. Please note in this that Dr. Hall's report of the MRI completed 1/3/93 indicates the foraminal narrowing has advanced compared to the plain film study of 7/6/92. The treatment options for this radicular pain is either to leave it as is, conservative management already having failed, or attempt to improve the circumstances for root healing by decompression/foraminotomy.

On March 12, 1993, Dr. Smith operated on Lucas to relieve the pain, and exactly one

month later Dr. Smith stated that the need for surgery was directly related to the automobile accident.

This surgery did relieve Lucas's pain, but State Farm claimed there was still an issue as to whether the back and neck pain was related to the accident or whether it was related to a degenerative, pre-existing condition. Rather than pay the surgery-related medical expenses, Dion requested an independent medical investigation to determine whether the surgery was related to the accident. State Farm submitted copies of Lucas's medical records to Medical Claims Review Services, Inc., (MCRS) which stated in its report dated April 26, 1993, that:

Mr. Lucas sustained musculoligamentous injuries during the accident of 6 July 1992. While he had a painful road to recovery, by 17 December 1992 most of his symptoms had resolved. There were prior injuries and degenerative disease of the spine that may have impacted his ongoing complaints, but there were no details about his pre-accident medical condition in the year prior to the accident of review. Therefore, it is our medical opinion that the accident-related treatment was appropriate, except for the above noted exceptions, through 17 December 1992.

Dion then sent the MCRS report to Lucas's attorney and informed him that she would not go beyond the report's recommendations, but that State Farm would continue to review items payable under Lucas's policy. Dion acknowledged that State Farm was aware that Lucas was presently attempting to resolve the liability claim directly with the third-party carrier, ANPAC. Dion requested Lucas's complete medical records for ten years prior to the accident, all x-rays, and the readouts of Lucas's EMG, CT and MRI studies. Dion stated that after receiving such information, State Farm "will forward for an independent causation review to help [them] determine what is payable."

Before the requested information was given to State Farm, however, Lucas settled his claim with ANPAC for $57,500 on June 22, 1993. Thereafter, on July 14, 1993, State Farm received the independent medical review from Dr. Burton which concluded that the narrowing of the C5–6 disk space responsible for Lucas's surgery "was more related to degenerative disease than to any form of clearly defined traumatically induced abnormalities." State Farm then notified Lucas that State Farm was no longer obligated to pay the surgery-related medical expenses because Lucas had settled his third-party claim for an amount in excess of the medical expenses, thereby contractually relieving State Farm from any obligation to pay. State Farm paid medical bills incurred totaling $5,466.36 but did not pay the surgery-related medical bills totaling $14,270.36.

Subsequently, on August 5, 1994, Lucas filed an action for damages against State Farm claiming that State Farm's failure to immediately pay the surgery-related medical expenses forced Lucas to settle with ANPAC. On February 29, 1996, State Farm moved for partial summary judgment seeking dismissal of the breach of contract and bad faith claims. On June 3, 1996, the district court granted State Farm's motion for partial summary judgment, concluding that the surgery-related claims submitted by Lucas that were not paid were "fairly debatable" and thus bad faith could not be asserted based on the failure to immediately pay those claims. On July 30, 1996, the district court clarified its previous order to reflect that summary judgment had been granted for both the breach of contract and bad faith claims. Thereafter, the parties stipulated to the dismissal of Barbara J. Dion as a party and to the dismissal of all remaining claims alleged in the complaint, including fraud and breach of fiduciary duty.

On appeal, Lucas asserts that the district court erred in granting State Farm's motion for summary judgment by holding that Lucas's surgery-related claims were "fairly debatable" and that, as a result, the failure to immediately pay those claims could not be the basis for a cause of action alleging that State Farm had acted in bad faith We agree and hold that State Farm has failed to show there was no genuine issue of material fact as to the question of "fairly debatable."

## II.

## DISCUSSION

### A.  Standard of Review.

Summary judgment will be granted when "the pleadings, depositions, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." I.R.C.P. 56(c); *Friel v. Boise City Housing Authority,* 126 Idaho 484, 485, 887 P.2d 29, 30 (1994). This Court's review of a district court's ruling on a motion for summary judgment is the same as that required of the district court when originally ruling on the motion. *East Lizard Butte Water Corp. v. Howell,* 122 Idaho 679, 681, 837 P.2d 805, 807 (1992), On review, as when the judgment is initially considered by the district court, this Court liberally construes the record in the light most favorable to the party opposing the motion, drawing all reasonable inferences and conclusions in that party's favor. *Friel,* 126 Idaho at 485, 887 P.2d at 30 (citing *Farm Credit Bank of Spokane v. Stevenson,* 125 Idaho 270, 272, 869 P.2d 1365, 1367 (1994)); *Harris v. Dep't of Health and Welfare,* 123 Idaho 295, 298, 847 P.2d 1156, 1159 (1992). If reasonable people could reach different conclusions or draw conflicting inferences from the evidence, a summary judgment motion must be denied. *Stevenson,* 125 Idaho at 272, 869 P.2d at 1367. However, if the evidence reveals no disputed issues of material fact, what remains is a question of law, over which this Court exercises free review. *Id.*

## B. Whether Lucas's Claim was "Fairly Debatable."

In the present case, Lucas asserts that the district court incorrectly concluded that the claims were "fairly debatable." Lucas contends that State Farm was obligated to pay Lucas's medical bills even if the accident only aggravated a pre-existing condition. Lucas had no problems prior to the accident; it was only after the accident that Lucas began to experience neck and back pain. Consequently, Lucas asserts that a genuine issue of material fact exists as to his bad faith claim.

In *White v. Unigard Mutual Ins.Co.,* 112 Idaho 94, 730 P.2d 1014 (1986), this Court held that in order to recover on a bad faith claim, the insured must show: (1) the insurer intentionally and unreasonably de-

nied or withheld payment; (2) the claim was not fairly debatable; (3) the denial or failure to pay was not the result of a good faith mistake; and (4) the resulting harm is not fully compensable by contract damages. *White,* 112 Idaho at 98–100, 730 P.2d at 1018–20. "An insurer does not act in bad faith when it challenges the validity of a 'fairly debatable' claim...." *White,* 112 Idaho at 100, 730 P.2d at 1020. Good faith and fair dealing with an insured does not include the payment of sums that are reasonably in dispute, but only the payment of legitimate damages. *Id.* at 97, 730 P.2d at 1017.

Therefore, the central issue is whether Lucas's surgery-related claim was reasonably in dispute, thus rendering the claim fairly debatable. More specifically, we must decide if a genuine issue of material fact exists as to whether State Farm was challenging the validity of a fairly debatable claim. The existence of a genuine issue of material fact as to whether the claim was fairly debatable is a question of law, freely reviewable by the appellate courts. *State v. Larios,* 125 Idaho 727, 728, 874 P.2d 538, 539 (1994).

The instant case has an issue similar to the recent cases of *Anderson v. Farmers Insurance Co. of Idaho,* 130 Idaho 755, 947 P.2d 1003 (1997) and *Roper v. State Farm Mut. Auto. Ins. Co.,* 131 Idaho 459, 958 P.2d 1145 (1998), addressing the question of whether the trial court should have granted summary judgment dismissing a claim alleging bad faith in each of those cases. In *Anderson,* Farmers Insurance consistently maintained that "Anderson's automobile accident was not a significant factor in causing her medical problems." *Id.* at 759, 947 P.2d at 1007. In fact, Farmers Insurance demanded arbitration because Anderson's claim was in dispute and paid the disputed amount only after the arbitration award was rendered. This Court held that "[t]here is no evidence to support Anderson's contention that her claim was not reasonably in dispute. Therefore, there is no genuine issue of material fact concerning her bad faith claim." *Id.* In *Roper,* there was medical evidence from several doctors who had examined Roper and reached different conclusions as to the causal relationship for

Roper's claimed injuries. We said that, "Considering the complex medical details of these claims and the differing responses by the numerous doctors involved, it is evident these claims were 'fairly debatable.'" *Id.,* 131 Idaho at 461, 958 P.2d at 1148.

The present case is distinguishable from *Anderson and Roper* in that there is evidence to support Lucas's assertion that his claim was not reasonably in dispute. Between the date of the accident, July 6, 1992, and March of 1993, Lucas was seen by six different doctors who appeared to be in disagreement as to the cause of Lucas's neck condition. None of the doctors were able to definitively state that Lucas's neck condition was pre-existing or related to the accident. However, on March 9, 1993, in response to Dion's letter asking what was the cause of Lucas's condition, Dr. Smith unequivocally stated that "per my understanding of the circumstances, [Lucas's condition] was triggered by the accident; however, Mr. Lucas was certainly more vulnerable on the basis of his foraminal stenosis which very likely proceeded [sic] the vehicular accident." Dr. Smith operated on Lucas and one month later still attributed the need for surgery to the accident. Drawing every reasonable inference in favor of Lucas, we conclude that Dr. Smith's diagnosis is sufficient evidence to support Lucas's contention that his claim was not reasonably in dispute. Thus, such evidence is sufficient to defeat State Farm's motion for summary judgment on the issue of whether the claim is fairly debatable.

### III.

### CONCLUSION

For the reasons stated above, the summary judgment is vacated on the basis that there are genuine issues of material fact as to whether Lucas's claim was fairly debatable. The case is remanded to the district court for further proceedings consistent with this opinion.

Costs are awarded to the appellants. Neither party is awarded attorney fees.

TROUT, C.J., and JOHNSON and SILAK, JJ., concur.

SCHROEDER, Justice, dissenting.

The Court's perception of the issue in this case opens the flood gates to bad faith claims with scant underpinnings and the potential for oppressive litigation that must ultimately be paid for in insurance rates. The Court notes that "the central issue is whether Lucas's surgery-related claim was reasonably in dispute, thus rendering the claim fairly debatable. More specifically, we must decide if a genuine issue of material fact exits as to whether State Farm was challenging the validity of a fairly debatable claim." The Court concludes that since Dr. Smith attributed the need for surgery to the accident, there was sufficient evidence to take this case beyond summary judgment on the basis that there was a question of fact on the issue of whether the claim was fairly debatable.

Doubtless there is evidence that the need for surgery can be attributed to the accident. That is not the dispositive point. There is also substantial medical evidence, excluding the Medical Claims Review Services, Inc. evaluation, that the need for surgery was not related to the accident. On the face of the medical history it is clear that the claim is fairly debatable. There is no opinion expressed by Dr. Smith or otherwise that the claim is not fairly debatable. With the abundance of differing medical opinions from treating physicians the claim in this case is clearly debatable.

If the courts are unable to perform a basic gatekeeping function to close out bad faith claims of this nature, it is time to re-examine *White v. Unigard* and adopt the approach set forth in Justice Bakes' dissent, treating such claims as breach of contract actions with punitive damages when appropriate.

In *White v. Unigard,* the Court made the following observation:

> The tort of bad faith breach of insurance contract, then, has its foundations in the common law covenant of good faith and fair dealing and is founded upon the unique relationship of the insurer and the insured, the adhesionary nature of the insurance contract including the potential for overreaching on the part of the insurer,

and the unique, "non-commercial" aspect of the insurance contact.

112 Idaho at 100, 730 P.2d at 1020 (emphasis added).

The underpinnings of *White v. Unigard* no longer exist. This Court has consistently treated a breach of the covenant of good faith and fair dealing as a contract claim and not a tort action. *See Hummer v. Evans,* 129 Idaho 274, 280, 923 P.2d 981, 987 (1996) ("A breach of the covenant [of good faith and fair dealing] is a breach of the employment contract, and is not a tort. The potential recovery results in contract damages, not tort damages.") (citing *Metcalf v. Intermountain Gas Co.,* 116 Idaho 622, 626, 778 P.2d 744, 748 (1989)); *Beco Constr. Co. v. City of Idaho Falls,* 124 Idaho 859, 865, 865 P.2d 950, 956 (1993) ("The covenant of good faith and fair dealing is implied in contract not in tort; the breach of which results in contract damages, not tort damages.") (citing *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.,* 121 Idaho 266, 288, 824 P.2d 841, 863 (1991)).

*White* now stands out by its divergence in creating a tort for the breach of the covenant of good faith and fair dealing in a contract. That divergence may be tolerable if the courts exercise a screening function. But when the opinion of a physician that medical treatment was necessary because of an accident can lead to a bad faith tort claim in the face of other medical evidence that the medical treatment did not relate to the accident, the *White* experiment has failed. It is no answer that the cases without merit will be screened out at trial. By that time the expenses of litigation will have done their damage to those who bear the burden of paying premiums. This is not misplaced sympathy for insurance companies and their shareholders. It is self-defense for consumers against premiums that must reflect the payment of claims. Under the facts of this case to be economically responsible a company must pay claims in which a doctor says the injury was the result of an accident regardless of the quality of medical evidence that says otherwise. To fail to pay means the company must incur the expenses of litigation which often will exceed the claim.

One of the observations in *White v. Unigard* is that "an action in tort will provide necessary compensation for insureds and incentive for insurers to settle valid claims." 112 Idaho at 98, 730 P.2d at 1018. Unfortunately, the construction given to the facts in this case provides an insurer an incentive (virtually a necessity) to pay invalid claims. That was not the intention of *White v. Unigard:* "Of course the mere failure to immediately settle what later proves to be a valid claim does not of itself establish 'bad faith.' As indicated earlier, the insured must show the insurer 'intentionally and unreasonably denies or delays payment....'" *Id.* at 100, 730 P.2d at 1020.

There is no reasonable reading of the facts in this case that State Farm intentionally or unreasonably denied payment. It has challenged the obligation to pay based upon significant medical evidence. If it is wrong, it has a contractual obligation to pay the claim and pay attorney fees to its insured. But there is no factual basis for a bad faith claim.

Generally, "the rule of stare decisis dictates that we follow [controlling precedent], unless it is manifestly wrong, unless it has proven over time to be unjust or unwise, or unless overruling it is necessary to vindicate plain, obvious principles of law and remedy continued injustice." *Houghland Farms Inc. v. Johnson,* 119 Idaho 72, 77, 803 P.2d 978, 983 (1990). This Court should overrule *White v. Unigard* to bring it in line with this Court's recognition that the breach of the covenant of good faith and fair dealing is a breach of contract, not a tort. Further, the Court should recognize that *White v. Unigard* is an unnecessary and aberrational extension of the law that is too costly to perpetuate. Overruling *White v. Unigard* would not mean that insureds would be without a remedy. The insureds have a claim for breach of contract, a right to attorney fees if successful, and a right to punitive damages if the insurance company's conduct is egregious. There may also be a claim for intentional infliction of emotional distress in limited instances. The insurance companies and their premium payers are, however, no longer held hostage to pay or else suffer a tort claim in cases such as this where the claim is

clearly debatable. Insureds get what they paid for. They do not get a club to wield whenever a debatable claim is presented.