# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49187

TERRI RICHARDSON MATTSON and
RANDY MATTSON, Husband and Wife,

    Plaintiffs-Appellants,

v.

IDAHO DEPARTMENT OF HEALTH AND
WELFARE and LAURIE GALLEGOS,
PA-C;

    Defendants-Respondents,

and

DOES 1 through 20, inclusive,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, January 2023 Term

Opinion filed: May 4, 2023

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the First Judicial District of the State of Idaho, Shoshone County. Scott L. Wayman, District Judge.

The judgment of the district court is <u>vacated,</u> its summary judgment decision is <u>affirmed in part</u> and <u>reversed in part</u>, and this case is <u>remanded for further proceedings.</u>

Layman Law Firm, PLLP, Spokane, Washington and Vickery & Shepherd, LLP, Houston, Texas, for Appellants. John Layman (local counsel) appeared, and Andy Vickery (pro hac vice) argued.

Lake City Law Group, PLLC, Coeur d'Alene, for Respondents. Peter Erbland argued.

---

BRODY, Justice.

This appeal involves a medical malpractice action and whether a provision of the Idaho Tort Claims Act ("ITCA") immunizes the state and its employees from liability. In 2018, Terri Richardson Mattson ("Mattson") and her husband filed this action against the Idaho Department

of Health and Welfare, and its employee, Laurie Gallegos, a certified physician assistant ("Defendants"), alleging medical malpractice and failure to obtain informed consent related to outpatient mental health services Mattson received from Defendants. As a part of those services, Gallegos prescribed Mattson Prozac (fluoxetine), an antidepressant. Roughly one month later, the day of her follow up appointment with Gallegos, Mattson woke up, took a firearm from her gun cabinet, went to the liquor store, bought a bottle of vodka, drank the entire bottle while driving to her follow up appointment, and when she arrived in the Department's parking lot, fired the gun into her head. Mattson survived but suffered extensive injuries. Subsequently, Mattson and her husband filed this action.

The district court granted summary judgment to Defendants on two grounds: (1) Defendants were immune from liability under the ITCA, I.C. § 6-904A(2), because Mattson's claims arose out of injuries sustained while she was receiving services from a "mental health center"; and (2) the "reckless, willful and wanton conduct" exception to immunity did not apply as a matter of law. Mattson and her husband timely appealed the decision.

For the reasons set forth below, we affirm the district court's decision that Mattson's and her husband's claims fall within the purview of the "mental health center, hospital or similar facility" immunity provision in Idaho Code section 6-904A(2). However, we reverse the district court's decision that there is no triable jury question under the "reckless, willful and wanton conduct" exception to immunity. Mattson has alleged sufficient facts at summary judgment to demonstrate that a reasonable person could find that Defendants' acts or omissions were "reckless, willful and wanton[.]" *See* I.C. §§ 6-904A, 6-904C(2). Thus, we vacate the judgment and remand this case for further proceedings.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

There are basic facts underlying this case that are largely undisputed—but there are also facts relating to duty, breach, and causation that are heavily disputed. Because this is an appeal from the grant of summary judgment to Defendants, at this stage, the facts are construed in the light most favorable to Mattson and her husband, the nonmoving parties.

For roughly two months, from April 14, 2018, to June 21, 2018, Mattson received outpatient mental health services from Defendants before she attempted suicide. At the start of treatment, Mattson signed an "Informed Consent for Treatment" form (which did not include

information or disclosures about Prozac). Three days later, Mattson completed an intake form concerning her medical and mental health history. On that form, Mattson indicated she had a problem with alcohol in the past and that she was experiencing anxiety and depression. Mattson further reported that she had never attempted suicide and that she did not have current suicidal thoughts. However, as her husband later clarified to Defendants, and as the medical records document, Mattson's reports were not entirely candid.

Seven days after completing these forms, on April 24, 2018, Mattson had her first appointment at the Department, and was seen by a licensed professional counselor, Eve Heart, for diagnosis and evaluation. During this appointment, Mattson explained that she had suffered from depression since her teenage years, and informed Heart of her history of suicidality. This included a history of two suicide attempts by Mattson: one at age seventeen when she sliced her wrist "in an attempt to kill herself[,]" and one at age forty, when she "drove to a bridge and stood on the edge debating whether to jump after her ugly divorce." Mattson also informed Heart that she currently had "sleep loss, trouble focusing on tasks, and overwhelming stress about everyone and everything." Mattson denied having current suicidal thoughts, while Mattson's husband informed Heart that Mattson was having current suicidal thoughts. Mattson also informed Heart at the evaluation that she had "relapsed" on alcohol four months before the appointment and had been lying about her drinking to her husband.

Heart diagnosed Mattson with Major Depressive Disorder, recurrent severe (without psychotic features); tremor, unspecified ("[t]remors in hands with or without meds"); and "[o]ther specified problems related to psychosocial circumstances[.]" Based on various risk and protective factors, Heart determined that Mattson was at "[m]oderate" risk for suicide. From this, Heart recommended, among other things, "[m]oderate" outpatient services, psychiatric and pharmacological management and psychotherapy, and substance use disorder treatment if Mattson was "unable to maintain sobriety."

Afterward, Mattson was scheduled for a psychiatric evaluation at the Department a few weeks out, on May 16, 2018, with Gallegos. Leading up to her first appointment with Gallegos, Mattson had multiple contacts with Heart. One week after her initial appointment with Heart, Mattson had a face-to-face meeting with Heart and reported she was "ill" and wanted to "purge" her trauma orally. Two days later, during a phone call, Mattson reported to Heart she had "recently drank [sic] ½ pint of vodka, and has had 'backslides' in drinking and 'hiding it for four

3

months.' " One day later, Mattson had a second face-to-face meeting with Heart and reported that her anxiety was "high" and that she had lost her job. Ten days after that meeting, Mattson had a third face-to-face meeting with Heart at which she reported that "her husband had recently found another ½ pint of vodka in her purse" and Mattson reported that she had been lying about her drinking for several months. Heart recommended Alcoholics Anonymous or Alliance for Rehab. At her later deposition, Mattson testified that after that third meeting, she did not drink alcohol again until the day of her suicide attempt (June 21, 2018).

Two days after her third face-to-face meeting with Heart, on May 16, 2018, Mattson met with Gallegos for her scheduled psychiatric evaluation. At her later deposition, Gallegos testified that she reviewed all of the chart notes from Heart on Mattson and spoke to Heart about Mattson before the psychiatric evaluation. Gallegos also testified that she spent ninety minutes evaluating Mattson that day. In contrast, Mattson testified her evaluation with Gallegos lasted for "about five minutes[.]"

The medical record from Mattson's evaluation that day reflects that Mattson denied current suicidal ideation, had suffered with depression for twenty years, had a history of substance abuse, and that her depression symptoms include "thoughts of suicide, low self-worth, hypersomnia, decreased activities of daily living and lack of motivation." The "impression" of Mattson recorded by Gallegos included the same diagnosis of Major Depression, recurrent, severe (without psychotic features) as recorded by Heart. Gallegos did not diagnose Mattson with a current alcohol or substance use disorder. The treatment plan from Gallegos started Mattson on a prescription of Prozac, an antidepressant in the class of selective serotonin reuptake inhibitors (SSRI), and recommended that Mattson return in two weeks for a follow up visit. At the end of the evaluation, Nurse Sarah Mitchell dispensed the Prozac to Mattson from a sample drawer at the Department.

Related to the prescribing and dispensing of Prozac that day, Mattson testified that she never received: (1) medication handouts related to Prozac, (2) warnings about Prozac, (3) the manufacturer's written material on Prozac (typically attached to a prescription bottle received at a pharmacy), or (4) any other written material about Prozac. Mattson's husband also testified that he was never warned that Prozac could lead to suicidal tendencies, and that he never saw any handouts or written material about Prozac from Defendants. According to Mattson, there is a particular "Patient Mediation Guide" handout for Prozac that is required by the Food and Drug

Administration ("FDA") to be given to patients that includes warnings about monitoring requirements for induced suicidality. Gallegos appears to have admitted this FDA handout was not given to Mattson at her psychiatric evaluation. Instead, Gallegos testified that a different handout on Prozac was given to Mattson (which Mattson denies).

Relevant to this, Prozac includes two "Black Box" warnings on its manufacturer labeling mandated by the FDA. The first Black Box states: "WARNING: SUICIDAL THOUGHTS AND BEHAVIORS" and provides two interrelated but apparently separate warnings: (1) "Increased risk of suicidal thinking and behavior in children, adolescents, and young adults taking antidepressants"; and (2) "Monitor for worsening and emergency of suicidal thoughts and behaviors[.]" The second Black Box reiterates these warnings but adds information. Related to the first warning, the second Black Box adds that "studies did not show an increase in the risk of suicidal thoughts and behavior with antidepressant use in patients over age 24" (Mattson is over age 24). Related to the second warning, the second Black Box adds that "[i]n patients of all ages who are started on antidepressant therapy," medical providers must "monitor closely for worsening and for emergence of suicidal thoughts and behaviors" and "[a]dvise families and caregivers of the need for close observation and communication with the prescriber."

At her later deposition, Mattson testified that if she had been informed of the increased suicidality risks associated with Prozac, she never would have consented to the medication.

Two days after starting Prozac, on May 18, 2018, Mattson met with Heart and reported that she was "[n]ot seeing much result" and that she "don't [sic] generally like Prozac[.]" Mattson's husband was also present, and reported to Heart that Mattson did not want to take Prozac and that it did not seem to be "helping" Mattson. Mattson's husband testified that Heart "more or less" told him "that she was the professional, and just leave it up to her, and that [Mattson] needed to continue taking those pills because she hadn't been taking them long enough to really accumulate enough of it to . . . see if it was working or not." In other words, Heart— who is not a nurse, pharmacist, or other medical professional—informed Mattson that Prozac needs time to "build up in the body," and encouraged Mattson to continue taking Prozac as prescribed.

Twelve days later, on May 30, 2018, Mattson attended the two-week follow up visit related to her Prozac treatment. Mitchell saw Mattson that day, and according to the medical records, Mattson reported that she wanted to "stop Prozac and be on no meds because she didn't

want 'crazy meds.' " Mattson further reported increased anxiety and headaches since starting Prozac. Nevertheless, Mattson apparently agreed to continue taking Prozac after Mitchell provided "education" on how Prozac works. Gallegos did not physically see Mattson that day but did have a "specific conversation" with Mitchell regarding Mattson. According to Gallegos and the Department, Mattson was not "compliant" with taking Prozac as prescribed and had missed "some" doses. Conversely, according to Mattson, she had consistently taken Prozac as prescribed during those first two weeks. At the conclusion of her visit, Mattson was again prescribed Prozac by Gallegos and thirty pills were dispensed to Mattson from the Department's in-house "stock" like before. In response to Mattson's complaints, Gallegos recommended that Mattson change to taking Prozac at bedtime, and Mitchell relayed that new instruction to Mattson.

Roughly three weeks later, on June 21, 2018, the day of her next follow up appointment at the Department with Gallegos, Mattson attempted suicide. At her deposition, Mattson described that day as an "out-of-body" or "out-of-mind" experience, and sequentially recounted that day as follows: she woke up; attempted (unsuccessfully) to call-in sick to work; put on her work uniform; retrieved a .22 caliber handgun from her gun cabinet; traveled to a nearby liquor store and bought a bottle of vodka; drank the entire bottle during her ten mile drive to the Department; parked in the lot outside the Department; and then, heard the sound of the gun. Mattson had shot herself in the head that morning, survived, and suffered extensive injuries, "including but not limited to, the loss of an eye, severe memory issues, traumatic brain injury, disfigurement, severe behavioral issues, and other injuries and damages."

## B. Procedural Background

Less than two years later, Mattson filed a complaint against Gallegos and the Department for medical malpractice and failure to obtain informed consent. During discovery, the parties deposed Gallegos, Heart, Mitchell, Mattson, and Mattson's husband. After these depositions, Defendants moved for summary judgment on both claims. Defendants argued that they were entitled to judgment as a matter of law because there was no genuine dispute of material fact that Defendants met the relevant community standard of care in treating Mattson; that Mattson received informed consent to her treatment; and that Defendants were otherwise entitled to governmental immunity under Idaho Code section 6-904A(2) from Mattson's claims because they arose out of injuries to a person receiving mental health services from a "mental health center," within the meaning of that statute. In support, Defendants attached, among other things,

deposition excerpts, and a declaration providing the expert opinion of James Michael Smith, a certified physician assistant with qualifications in psychiatry and a doctorate in health science.

In response, Mattson and her husband argued that summary judgment was inappropriate because there were disputed issues of material fact under both the medical malpractice and informed consent claims; there was sufficient evidence of the standard of care, breach, and causation to submit the case to a jury; Defendants were not entitled to immunity under Idaho Code section 6-904A(2) because that statute does not apply to claims arising out of noncustodial outpatient mental health services; and even if Defendants enjoy immunity, there is a triable jury question on whether the "reckless, willful and wanton conduct" exception to immunity under section 6-904A applies to the facts of this case. In support, Mattson and her husband attached, among other things, deposition excerpts, exhibits, and a declaration (with an attached report) providing the expert opinion of David Healy, M.D., FRCPsych.

Ten days after briefing was complete, the district court held a hearing on Defendants' motion, and one month later, issued a written decision. The district court determined, among other things, that there were disputed issues of material fact regarding the claims of medical negligence and lack of informed consent that would typically preclude summary judgment in favor of Defendants. However, the district court nevertheless granted summary judgment to Defendants for two reasons. First, as argued by Defendants, the district court determined that Defendants were entitled to immunity from Mattson's and her husband's claims under the "mental health center, hospital or similar facility" clause in Idaho Code section 6-904A(2). Second, there was no triable jury question under the "reckless, willful and wanton" exception to immunity under that statute because it was unforeseeable that Mattson would "obtain[] a firearm that morning[,]" "[drive] to the store and [buy] a bottle of vodka[,]" "[drink] the entire bottle of vodka as she drove" to the Department, and "[shoot] herself" in the Department's parking lot. In other words, no reasonable person could foresee and find that Defendants' acts or omissions rose to the level of "reckless, willful and wanton conduct." Thus, there was no jury question on the exception to immunity under Idaho Code section 6-904A. Mattson and her husband timely appealed the grant of summary judgment on both grounds to this Court.

## II.    STANDARD OF REVIEW

"We review a district court's grant of summary judgment de novo, and apply the same standard used by the district court in ruling on the motion." *Marek v. Hecla, Ltd.*, 161 Idaho 211,

214, 384 P.3d 975, 978 (2016). That standard was thoroughly set out in *Harris v. State, Department of Health & Welfare*, as follows:

> A strong line of cases weaves a tight web of authority that strictly defines and preserves the standards of summary judgment. The reviewing court must liberally construe disputed facts in favor of the nonmoving party and make all reasonable inferences in favor of the party resisting the motion. If the record contains any conflicting inferences upon which reasonable minds might reach different conclusions, summary judgment must be denied. Nevertheless, when a party moves for summary judgment, the opposing party's case must not rest on mere speculation because a mere scintilla of evidence is not enough to create a genuine issue of fact.
>
> The burden of proving the absence of a material fact rests at all times upon the moving party. This burden is onerous because even "circumstantial" evidence can create a genuine issue of material fact. However, the Court will consider only that material contained in affidavits or depositions which is based upon personal knowledge and which would be admissible at trial. Summary judgment is properly issued when the nonmoving party bearing the burden of proof fails to make a showing sufficient to establish the existence of an element essential to that party's case.

123 Idaho 295, 298, 847 P.2d 1156, 1159 (1992) (internal citations omitted).

In *Czaplicki v. Gooding Joint School District No. 231*, we provided the standard for ruling on a motion for summary judgment where an immunity defense under the ITCA is potentially involved:

> In ruling on a motion for summary judgment based upon an immunity defense under the Idaho Tort Claims Act (ITCA), a trial judge should first determine whether the plaintiffs' allegations and supporting record generally state a cause of action for which "a private person or entity would be liable for money damages under the laws of the state of Idaho." The court must then determine whether an exception to liability under the ITCA shields the alleged misconduct from liability.

116 Idaho 326, 330, 775 P.2d 640, 644 (1989) (internal citation and footnote omitted).

In this appeal, we are also called on to interpret Idaho Code section 6-904A(2), an immunity provision in the ITCA. "The interpretation of a statute is a question of law this Court reviews de novo." *Nelson v. Evans*, 166 Idaho 815, 820, 464 P.3d 301, 306 (2020) (quoting *State v. Smalley*, 164 Idaho 780, 783, 435 P.3d 1100, 1103 (2019)).

8

### III. ANALYSIS

**A. Idaho Code section 6-904A(2) provides immunity for negligence claims arising out of injuries by or to a person receiving outpatient mental health services.**

"The ITCA provides that a governmental entity is liable for 'money damages arising out of the negligent or otherwise wrongful acts or omissions of its employees acting within the course and scope of their employment or duties' if a private person would be liable for such acts under state law." *Shubert v. Ada Cnty.*, 166 Idaho 458, 468, 461 P.3d 740, 750 (2020) (quoting I.C. § 6-903(1)). However, the ITCA also provides several limitations on governmental liability (i.e., grants of immunity) and allows exceptions to those grants of immunity. In this case, the first issue is whether Mattson's negligence claims fall within the purview of the ITCA, I.C. § 6-904A(2), where it provides immunity to the government and its employees for claims arising out of injury "to a person receiving services from a mental health center, hospital or similar facility":

> EXCEPTIONS TO GOVERNMENTAL LIABILITY. *A governmental entity and its employees while acting within the course and scope of their employment* and without malice or criminal intent *and without reckless, willful and wanton conduct* as defined in section 6-904C, Idaho Code, *shall not be liable for any claim which*:
>
> [. . . .]
>
> 2. *Arises out of injury* [(1)] to a person or property by a person under supervision, custody or care of a governmental entity or [(2)] by or to a person who is on probation, or parole, or who is being supervised as part of a court imposed drug court program, or any work-release program, or [(3)] *by or to a person receiving services from a mental health center, hospital or similar facility*.

I.C. § 6-904A(2) (emphasis and alterations added).

In its decision at summary judgment, the district court determined that, in accordance with the plain language of this statute, Mattson is a "person" receiving "services" from a mental health center or facility of the state and its employees. Thus, the state (the Department) and its employee (Gallegos) were immune from liability for Mattson's injuries.

On appeal, Mattson argues that the district court erred because the "mental health center, hospital or similar facility" clause in section 6-904A(2) does not apply to her situation, i.e., negligence claims arising out of injuries to a person receiving noncustodial outpatient mental health services from the state and its employees. Mattson advances two points in support of this position: (1) section 6-904A(2) was intended to shield the government and its employees from

9

liability to *third persons* that are injured by the unpredictable acts of persons who are under the government's custody, supervision, and care; and (2) noncustodial outpatient mental health services are not within the purview of section 6-904A(2) because such services do not involve a custodial relationship with the government—unlike every other category of persons in the other immunity clauses of that section. *See* I.C. § 6-904A(2) (providing immunity for claims arising out of injuries "by or to" a person who is on probation, parole, in a supervised court imposed drug program, or any work-release program).

In response, Defendants argue that the "by or to" language preceding the "mental health center, hospital or similar facility" clause plainly provides immunity beyond claims asserted by injured third persons. In other words, to avoid reading "by or to" out of the statute, Defendants argue that section 6-904A(2) provides immunity from both: (1) claims by third persons who were injured "by" a patient receiving services from a state mental health center, hospital or similar facility, and (2) claims by the patient of injuries "to" the patient arising out of services received from a state mental health center, hospital or similar facility. Thus, Defendants maintain that the "mental health center, hospital or similar facility" clause unambiguously includes all forms of mental health services (e.g., outpatient, residential, or inpatient).

In reply, Mattson shifts gears and argues that the clause "person receiving services from a mental health center, hospital or similar facility" is "poorly written" and "ambiguous at best." If the clause is ambiguous, Mattson argues that it must be construed in accordance with the purpose of the original ITCA legislation which made "liability [. . .] the rule and immunity [. . .] the exception." *Rees v. State, Dep't of Health & Welfare*, 143 Idaho 10, 19, 137 P.3d 397, 406 (2006) (alterations added)). In support, Mattson points to *Sherer v. Pocatello School District No. 25*, 143 Idaho 486, 493, 148 P.3d 1232, 1239 (2006), where this Court said that the various clauses in Idaho Code section 6-904A(2)—including the "mental health center, hospital or similar facility" clause—are generally aimed at a "nonconsensual, custodial relationship under which it is primarily the government, rather than the individual, that bears a duty." According to Mattson, section 6-904A(2) immunity does not apply in her case because her injuries arose out of *outpatient* mental health services, where there was a consensual and noncustodial relationship with the Department and Gallegos—unlike the relationship between the government and persons on probation, parole, in drug court or work-release programs, and in mental health hospitals.

10

In sum, Mattson asks us to read the "mental health center, hospital or similar facility" clause in section 6-904A(2) as excluding from its grant of immunity claims by patients who were injured while receiving noncustodial outpatient mental health services. We decline Mattson's invitation.

1. Idaho Code section 6-904A(2) provides, through a stand-alone clause, immunity for any claim arising out of injuries "by or to" a person receiving services from a state "mental health center, hospital or similar facility."

Mattson spends much of her briefing characterizing Idaho Code section 6-904A(2) as an immunity statute intended to *only* protect the government and its employees from the "unpredictable acts of third parties" and where the person causing the harm was under "the supervision, custody, or care" of the government. Mattson also argues that the multiple grants of immunity in section 6-904A(2), under differing categories of persons and claims, should be read and construed together, as one uninterrupted sentence—not as separate stand-alone clauses. For the reasons below, Mattson's interpretation is contrary to the plain language of the statute.

"Interpretation of a statute begins with an examination of the statute's literal words. Where the language of a statute is plain and unambiguous, courts give effect to the statute as written, without engaging in statutory construction." *In re Adoption of Doe*, 156 Idaho 345, 349, 326 P.3d 347, 351 (2014) (quoting *Stonebrook Constr., LLC v. Chase Home Fin., LLC*, 152 Idaho 927, 931, 277 P.3d 374, 378 (2012)). In this case, we are called to interpret one immunity clause in Idaho Code section 6-904A(2). Although section 6-904A(2) is not the model of clarity, it plainly contains three separate clauses—each providing for its own grant of immunity—with the third clause ("mental health center, hospital or similar facility") at issue in this case:

> A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent and without reckless, willful and wanton conduct as defined in section 6-904C, Idaho Code, shall not be liable for any claim which:
>
> [. . . .]
>
> 2. *Arises out of injury* [(1)] to a person or property by a person under supervision, custody or care of a governmental entity or [(2)] by or to a person who is on probation, or parole, or who is being supervised as part of a court imposed drug court program, or any work-release program, or [(3)] *by or to a person receiving services from a mental health center, hospital or similar facility*.

I.C. § 6-904A (alterations and emphasis added).

11

Contrary to Mattson's approach, the "supervision, custody or care" clause (the first clause) cannot be read as part and parcel of the "mental health center, hospital or similar facility" clause (the third clause). Each are separate clauses that stand independently, where Idaho Code section 6-904A, if restyled appropriately, plainly reads in the following way:

> A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent and without reckless, willful and wanton conduct as defined in section 6-904C, Idaho Code, shall not be liable for any claim which:
>
> [. . . .]
>
> 2. Arises out of injury[:]
>
>> [(1)] to a person or property by a person under supervision, custody or care of a governmental entity[;] or
>>
>> [(2)] by or to a person who is on probation, or parole, or who is being supervised as part of a court imposed drug court program, or any work-release program[;] or
>>
>> [(3)] by or to a person receiving services from a mental health center, hospital or similar facility.

I.C. § 6-904A (emphasis and alterations added).

Thus, Mattson's reliance on *Sherer*, 143 Idaho at 493, 148 P.3d at 1239, for her position that this statute is aimed *only* at injured third parties or injuries to patients in a custodial mental health setting is misplaced. The meaning of the first and third clauses in section 6-904A(2), as separate and independent grants of immunity, do not translate into one uninterrupted and unified scope of immunity. Thus, the holding of *Sherer*, and its statement that all three of the immunity clauses in section 6-904A(2) involve a "nonconsensual, custodial relationship[,]" must be limited to the interpretation of the first clause (the "supervision, custody or care of a governmental entity" clause)—the only clause before the Court in *Sherer*.

When we examine the "by or to" language in the "mental health center, hospital or similar facility" clause, it plainly grants immunity to the state and its employees from two types of claims. First, the "injury . . . *by* . . . a person" language immunizes the state and its employees from claims by a third party who suffered injuries at the hands of a person receiving services from a governmental mental health center, hospital, or similar facility. I.C. § 6-904A(2); *see Blackhawk v. City of Chubbuck*, 488 F. Supp. 2d 1097, 1100–01 (D. Idaho 2006). Second, the "injury . . . *to* . . . a person" language immunizes the same from claims by a patient for injuries to

the patient arising out of services they received from a governmental mental health center, hospital, or similar facility. I.C. § 6-904A(2); *see Blackhawk*, 488 F. Supp. 2d at 1100–01; *see also Shubert*, 166 Idaho at 470, 461 P.3d at 752 (interpreting the "by or to" language prefacing the second immunity clause in Idaho Code section 6-904A(2) as it relates to probationers).

In sum, Mattson's treatment of section 6-904A(2) as one uninterrupted sentence, and only aimed at injuries to third parties or injuries to persons in a custodial relationship with the state, is contrary to the plain meaning of the statute. As explained below, the "mental health center, hospital or similar facility" clause plainly provides immunity to the state and its employees from claims arising out of injuries to persons receiving noncustodial outpatient services.

2. The plain meaning of "person receiving services from a mental health center, hospital or similar facility" includes noncustodial outpatient services provided by the state.

To reiterate, the clause at issue provides that: "A governmental entity and its employees while acting within the course and scope of their employment . . . shall not be liable for any claim which: . . . [a]rises out of injury . . . to a person receiving services from a mental health center, hospital or similar facility." I.C. § 6-904A(2) (alteration added). The word "mental health" is an attributive noun (a noun that acts like an adjective) which modifies the three nouns that follow it: center, hospital, and facility. *See id*. The terms "center," "hospital," and "facility" are not defined in the ITCA. *See* I.C. §§ 6-901 to -929.

In the absence of statutorily adopted definitions we often turn to the dictionary for their plain meaning. *See State v. Clark*, 168 Idaho 503, 508, 484 P.3d 187, 192 (2021). Here, the dictionary definitions of these terms show that the scope of services from a "mental health center, hospital or similar facility" broadly includes any mental health services provided in any type of governmental building, i.e., "center, hospital or similar facility[,]" I.C. § 6-904A(2). *See Center*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/center (last visited Apr. 26, 2023) ("[A] facility providing a place for a particular activity or service"); *Hospital*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/hospital (last visited Apr. 26, 2023) ("1: [A] charitable institution for the needy, aged, infirm, or young; 2: an institution where the sick or injured are given medical or surgical care"); *Facility*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/facility (last visited Apr. 26, 2023) ("[S]omething (such as a hospital) built, installed, or established to serve a particular purpose"). Thus, the clause applies to every

type of setting in which mental health services are provided, e.g., outpatient, residential, and inpatient.

When a statute is unambiguous, "this Court does not construe it, but simply follows the law as written." *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 893, 265 P.3d 502, 506 (2011) (quoting *State v. Schwartz*, 139 Idaho 360, 362, 79 P.3d 719, 721 (2003)). The law as written under Idaho Code section 6-904A(2) plainly provides immunity from claims arising out of injuries to a person receiving outpatient mental health services, from any type of governmental building, and regardless of whether the patient is in a custodial or supervisory relationship with the state and its employees.

Here, Mattson's and her husband's medical malpractice and lack of informed consent claims arose out of injuries to Mattson while she was receiving outpatient services from a state mental health center or facility (the Department's building), and from a state employee, Gallegos. Thus, at summary judgment, the district court correctly concluded that the "mental health center, hospital or similar facility" clause in section 6-904A(2) applies to immunize Defendants from Mattson's and her husband's claims of ordinary negligence. However, before we can answer whether complete immunity exists, we must address the second issue raised by Mattson on appeal: Whether there are sufficient facts in the record to create a disputed issue of material fact on the "reckless, willful and wanton conduct" exception to immunity under Idaho Code section 6-904A. For the reasons discussed below, we conclude that Mattson has alleged sufficient facts to create a triable jury question on this exception to immunity.

**B. There is a triable jury question on whether Defendants' alleged negligence amounted to "reckless, willful and wanton" conduct under section 6-904A.**

Even when the government and its employees qualify for immunity for ordinary acts of negligence under Idaho Code section 6-904A(2), immunity is not conferred where the degree of negligence amounts to "reckless, willful and wanton conduct" as defined by Idaho Code section 6-904C(2). Section 6-904C(2) defines "[r]eckless, willful and wanton conduct" as "present only when a person intentionally and knowingly does or fails to do an act creating unreasonable risk of harm to another, and which involves a high degree of probability that such harm will result." If there are sufficient facts such that a reasonable person could find the alleged negligence of a defendant amounts to "reckless, willful and wanton" conduct, then a grant of

14

summary judgment to that extent based on section 6-904A(2) immunity is improper. *See Harris*, 123 Idaho at 298–99, 847 P.3d at 1159–60.

In this case, the district court concluded that the "reckless, willful and wanton" conduct exception did not apply as a matter of law. To reach its conclusion, the district court found that Defendants were acting in "good faith" when providing services to Mattson, and then reasoned that, as a matter of law, no reasonable person could foresee that Mattson would engage in the "unpredictable" acts of "obtain[ing] a firearm that morning[,]" "[driving] to the store and [buying] a bottle of vodka[,]" "[drinking] the entire bottle of vodka" as she drove to the Department, and "[shooting] herself" in the Department's parking lot instead of attending her appointment with Gallegos. From this, the district court determined that there was no triable jury question on the "reckless, willful and wanton" exception to section 6-904A(2) immunity and granted summary judgment in favor of Defendants on all claims.

On appeal, Mattson argues that the district court erred by making a "good faith" credibility determination in favor of the movants (Defendants) instead of the nonmovants (Mattson and her husband) at summary judgment. Mattson then argues that once this error is corrected, and all inferences are drawn in favor of the nonmovants (Mattson and her husband), the district court's "foreseeability" determination supplanted the role of the jury. Mattson argues that she has sufficiently alleged facts showing that (1) Defendants engaged in conduct creating an unreasonable risk of harm, e.g., Defendants knowingly failed to monitor Mattson's treatment, provide her with appropriate medication treatment, provide her with warnings and information about "Prozac-induced suicidality," and alert her "family and caregivers" of that same danger; (2) Dr. Healy—Mattson's expert witness—testified that Defendants' knowing acts and omissions created a high degree of probability that attempted suicide by Mattson would occur; and (3) Mattson's attempted suicide was a foreseeable result of Defendants' knowing acts and omissions. In response, Defendants maintain that nothing in the record shows a reasonable person could find the degree of Defendants' alleged negligence amounted to "reckless, willful and wanton" conduct. Thus, Defendants contend that the district court correctly concluded the exception to immunity did not apply.

For the reasons below, we conclude that the district court erred in granting summary judgment to Defendants on the "reckless, willful and wanton" exception to immunity. As a preliminary matter, the district court misapplied the concept of foreseeability, and improperly

15

drew a "good faith" inference in favor of the moving party (Defendants) instead of viewing the facts and inferences in a light most favorable to the nonmoving parties (Mattson and her husband). After correcting these errors, and applying our de novo standard of review, *Marek*, 161 Idaho at 214, 384 P.3d at 978, there are sufficient facts in the record such that a reasonable person could find that the degree of Defendants' alleged negligence amounted to "reckless, willful and wanton" conduct. Thus, there is a triable jury question on whether this exception to immunity under Idaho Code section 6-904A(2) applies.

1. Under the "reckless, willful and wanton" conduct exception, the specific *kind* of harm must be foreseeable—not the specific *mechanisms* of harm.

In *Harris v. State, Department of Health & Welfare*, we used the "willful or wanton conduct" exception to Idaho's Recreational Use Statute (I.C. § 36-1604)—as articulated in *Jacobsen v. City of Rathdrum*, 115 Idaho 266, 270–71, 766 P.2d 736, 740–41 (1988)—to inform our understanding of the nearly identical "reckless, willful and wanton conduct" exception to immunity under the ITCA, I.C. §§ 6-904A and 6-904C(2). 123 Idaho 295, 299, 847 P.3d 1156, 1160 (1992). We then explained that conduct is "willful and wanton" if a person "intentionally does or fails to do an act, knowing or having reason to know" facts which would lead a reasonable person to realize that his conduct not only (1) creates "an unreasonable risk of harm to another"; but (2) "involves a high degree of probability that such harm would result." *Harris*, 123 Idaho at 299, 847 P.3d at 1160 (quoting *Jacobsen*, 115 Idaho at 270, 766 P.2d at 740); I.C. § 6-904C(2). The "key element" in the definition of "reckless, willful and wanton conduct" under the ITCA is "knowledge." *Harris*, 123 Idaho at 299, 847 P.3d at 1160 (citing *Jacobsen*, 115 Idaho at 272, 766 P.2d at 742). And the phrase "having reason to know" implies an element of "foreseeability[.]" *Harris*, 123 Idaho at 299, 847 P.3d at 1160 (quoting *Jacobsen*, 115 Idaho at 270, 766 P.2d at 740).

"The question whether a risk of harm is foreseeable is generally a question for the trier of fact[,]" *Caldwell v. Idaho Youth Ranch*, 132 Idaho 120, 125, 968 P.2d 215, 220 (1998), but in certain circumstances, we have held that "foreseeability" does not exist as matter of law. *See, e.g.*, *Harris*, 123 Idaho at 299, 847 P.3d at 1160 (holding foreseeability did not exist because the "kind of harm" suffered—"violence, particularly of a sexual nature, toward members of the public other than [the ward's] peers"—was not "manifest or ostensible, and highly likely to occur." (alteration added)). However, in other circumstances, there may be sufficient facts

16

for a triable jury question on whether alleged acts and omissions of the government and its employee(s) foreseeably created a high probability that a specific "kind of harm" would occur. *See, e.g.*, *Smith v. Bd. of Corr.*, 133 Idaho 519, 524, 988 P.2d 1193, 1198 (1999) (holding that summary judgment was inappropriate where the evidence reasonably showed that state employees knew the safety guards had been removed from the saws when the inmates were instructed to perform "dado cuts"—and injuries to the inmates' hands resulted). The point being that the "foreseeability" question at summary judgment is fact-intensive, and often case specific. Thus, while *Harris* and *Smith* inform our foreseeability analysis, these cases will not serve as dispositive factual analogs for the proper result in every case.

In this case, the district court misapplied the foreseeability element when it granted Defendants summary judgment. Rather than examining whether the specific "kind of harm" was foreseeable—i.e., an "attempted suicide" by Mattson—the district court examined whether the specific mechanisms of harm were foreseeable. In other words, the district court erroneously focused on whether it was foreseeable that Mattson would "obtain a firearm that morning[,]" "[drive] to the store and [buy] a bottle of vodka[,]" "[drink] the entire bottle of vodka as she drove" to the Department, and "[shoot] herself" in the Department's parking lot. To be clear, only the specific "kind of harm" must be foreseeable under Idaho Code sections 6-904A and 6-904C(2)—not the specific mechanisms of harm.

2. A reasonable person could find that Defendants' alleged negligence amounts to "reckless, willful and wanton conduct" under Idaho Code section 6-904A.

To reiterate, the "reckless, willful and wanton conduct" exception to immunity under Idaho Code section 6-904A, as defined by section 6-904C(2), is only present "when a person intentionally and knowingly does or fails to do an act creating unreasonable risk of harm to another, and which involves a high degree of probability that such harm will result."

Before we can apply this standard, we must clarify how the "reckless, willful and wanton conduct" exception to immunity under section 6-904A operates in the context of a medical malpractice action. In this case, what is at issue is the egregiousness of Defendants' alleged "breach" of the applicable standard of practice or care, and whether the degree of the "breach" amounts to "reckless, willful and wanton" conduct under Idaho Code section 6-904A. Unlike the question of breach in non-medical cases like *Harris* and *Smith*, in a medical malpractice action, the question of breach is first predicated by the statutory requirement that the plaintiff provide

17

"direct expert testimony" opining that the defendant "negligently failed to meet" the applicable community standard of practice or care. *See* I.C. § 6-1012.

However, we have held that the language of Idaho Code section 6-1012 does not require plaintiffs to provide "direct expert testimony" that the degree of defendant's breach amounted to "recklessness[,]" i.e., the "conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man." *Ballard v. Kerr*, 160 Idaho 674, 709, 378 P.3d 464, 499 (2016) (quoting *Carrillo v. Boise Tire Co., Inc.*, 152 Idaho 741, 751, 274 P.3d 1256, 1266 (2012)). Instead, before a recklessness determination can be made, the plaintiff must prove "that a defendant breached the standard of care as defined in section 6-1012"—not the exact degree or egregiousness of the breach, *Ballard*, 160 Idaho at 710, 378 P.3d at 500.

Once the breach is proven through direct expert testimony, "in many cases a lay person could determine whether a defendant made a conscious choice to engage in such conduct and whether the risk and high probability of harm were objectively foreseeable." *Id*. These principles operate no differently in a medical malpractice action within the purview of the "reckless, willful and wanton conduct" exception to immunity in Idaho Code section 6-904A. In such an action, a plaintiff *may* include "direct expert testimony" as to the egregiousness of a breach when appropriate, but Idaho Code section 6-1012 does not require it for the plaintiff to raise a triable jury question on whether the degree of the defendant's alleged negligence meets the "reckless, willful and wanton conduct" exception to immunity.

Instead, the plaintiff must show: (1) through direct expert testimony, that the "defendant breached the standard of care as defined in section 6-1012," *Id*.; and (2) through lay or expert testimony, that the defendant knew, or had reason to know, his or her intentional acts or omissions created an "unreasonable risk of harm to another," with "a high degree of probability that such harm would result." *Harris*, 123 Idaho at 299, 847 P.3d at 1160. In this medical malpractice action, the expert opinion of Dr. Healy, Mattson's expert witness, on the breach of the standard of care by Defendants—taken together with the other evidence of Defendants' knowledge during the relevant time period—is sufficient to create a triable jury question on the "reckless, willful and wanton conduct" exception to immunity.

To begin, Dr. Healy—with "over 30 years" of training, experience, and knowledge about antidepressants like Prozac—opined that Defendants' acts and omissions here breached the

18

applicable standard of care. Based on Mattson's psychiatric history, "the warning signs that [Mattson] had a prior intolerance to SSRIs [like Prozac] were clearly" present. Mattson's "alcohol intake in prior weeks was noted, but it was not noted that alcohol can be a way to combat the agitation these drugs can cause—being essentially the same as the tranquilizers that pharmaceutical companies have advocated (sotto voce) giving in the first few weeks of treatment to help ease it[.]" Dr. Healy opined that Defendants should have stopped the Prozac or changed the medication to a different class of antidepressant medicines (e.g., Mirtazapine (Remeron)) based on Mattson's "state of agitation, that [became] increasingly severe, accompanied by an apathy, or emotional blunting toward daily or ordinary activities" within the first two weeks of taking Prozac (i.e., symptoms of induced suicidality). Dr. Healy explained that "[t]he trials of Prozac were not in depressed patients at a high risk of suicide" like Mattson and that Prozac "has little benefit" in treating "severe depression" like Mattson's. More importantly, had Defendants properly warned Mattson and her husband about the potential "hazards" of Prozac and that proper monitoring is required because it can lead to suicide "when treatment is initiated," then the "treatment induced" suicide attempt by Mattson could have been "forestalled[.]"

Dr. Healy opined that Prozac was the cause of Mattson's suicide attempt, based on, among other things, an "induced toxic state" in Mattson, "characterized by akathisia [psychomotor agitation] along with a degree of emotional blunting." According to Dr. Healy, "[t]he timeline for the development of [Mattson's] problems and the violent nature of the event itself is consistent with what is known about SSRIs [(like Prozac)] and suicide induction."

Specific to the knowledge and foreseeability question in this appeal, Dr. Healy's declaration explained that he reviewed the deposition transcripts of Gallegos, Mitchell, Heart, and Mattson and her husband, along with Mattson's medical records. In their depositions, Gallegos and Mitchell both testified that they were aware of the warnings and advice from the manufacturer of Prozac, which included FDA mandated black box warnings. Under those black box warnings, section 5.1 concerns suicidality, and instructs medical providers that patients of "all ages" who are started on antidepressant therapy must be "monitor[ed] closely for worsening and for emergence of suicidal thoughts and behaviors" and that providers must "[a]dvise families and caregivers of the need for close observation and communication with the prescriber."

Section 5.1 goes on to explain that although a "causal link" between symptoms of "anxiety, agitation, panic attacks, insomnia, irritability, hostility, aggressiveness, impulsivity,

19

akathisia (psychomotor restlessness), hypomania, and mania" while taking Prozac—some of which Dr. Healy opined Mattson experienced and presented with—and "the worsening of depression and/or the emergency of suicidal impulses has not been established, there is concern that such symptoms may represent precursors to emerging suicidality." On this note, section 5.1 goes on to again instruct that "[a]ll patients" started on Prozac should be "monitored appropriately and observed closely for clinical worsening, suicidality, and unusual changes in behavior, especially during the initial few months of a course of drug therapy[.]" This includes alerting "[f]amilies and caregivers" to the "daily" need to monitor the patient "for the emergence of suicidality" and to report the symptoms listed above to health care providers.

Based on this, along with his education, training, background, and work experience, Dr. Healy opined that Gallegos and Mitchell "knew of the risk attendant to prescribing Prozac and intentionally failed to stop prescribing and specifically encouraged" Mattson to "continue to take the drug over her objections[.]" In Dr. Healy's expert opinion, Defendants' treatment of Mattson with Prozac; failure to properly monitor, notice, and respond to Mattson's emerging symptoms of induced suicidality; and failure to warn and inform Mattson and her family of the risks of Prozac and its warning signs for induced suicidality—created a "very high risk of harm" to Mattson, with a "high probability" of her attempting "suicide[.]"

Connected to and underlying Dr. Healy's expert opinion is the deposition testimony of Gallegos, Mitchell, and Heart, along with Mattson's medical records, which then evidences what Defendants knew, or had reason to know of, when acting or failing to act as of Mattson's first follow up appointment with Mitchell and Gallegos—two weeks after Mattson was prescribed Prozac and three weeks before her suicide attempt. Although many of the following facts appear to be disputed, for purposes of summary judgment, we must construe these facts, and draw all reasonable inferences, in favor of Mattson and her husband:

- Mattson had suffered from depression for over twenty years;
- Mattson's depression symptoms included "thoughts of suicide, low self-worth, hypersomnia, decreased activities of daily living and lack of motivation";
- Mattson had a history of substance use disorder;
- Mattson's depression was "exacerbated by her use of alcohol or either prescription or street drugs";
- Mattson had two past suicide attempts (one as a teenager and one as an adult);

20

- Mattson had a "pattern" of medication and treatment noncompliance (e.g., with Citalopram—another SSRI antidepressant like Prozac);

- Mattson had previously been prescribed Prozac and stopped using it;

- Mattson did not want to take Prozac and did not like being on Prozac;

- Mattson's anxiety had increased since starting Prozac;

- Mattson's anxiety on Prozac was "extreme" and additionally included headaches;

- Mattson had recent "backslides" in drinking alcohol before being prescribed Prozac, and Mattson had been hiding it from her husband;

- Although Mattson denied current suicidal ideation—her husband reported the opposite and suggested minimization or hiding of her suicidal ideation;

- Mattson's psychiatric evaluation with Gallegos on May 16, 2018, when she was initially prescribed Prozac, lasted for "about five minutes";

- Gallegos and Heart rated Mattson at a "moderate risk" for suicide, otherwise, if Mattson were thought to be "at high-risk for suicide, that's a patient that [Gallegos] would have placed in the hospital";

- Neither Mattson nor her husband were given any warnings regarding Prozac's risk of suicidality, need for monitoring, or any written information on Prozac through a patient handout, manufacturer label, or otherwise;

- Mattson did not drink alcohol between the time Prozac was prescribed and up to the day of her suicide attempt on June 21, 2018;

- Mattson took Prozac consistently as prescribed during that time;

- Prozac has the effect of reducing serotonin molecules in the presynaptic cleft during the first two weeks of treatment—the opposite of the desired effect for treatment of depression;

- During the first two weeks of taking Prozac, Mattson felt "terrible," was more depressed and anxious, could not focus at her job, struggled to function in her daily activities due to a "mood altering" effect, was apathetic and constantly hand wringing, and would sit in a chair "all day" not wanting to do anything; and

- Mattson would not have consented to taking Prozac had she been warned about its risks of induced suicidality.

As for the day of her suicide attempt, June 21, 2018, Mattson testified that much of it was an "out of body experience" and was a "blank slate," but she recalled waking up, attempting to call in sick to her work, retrieving her .22 caliber handgun out of her gun cabinet, traveling to a nearby liquor store, buying a bottle of vodka, drinking the entire bottle during her ten mile drive to the Department, parking in the lot outside the Department, and then hearing the sound of the gun. Once the above facts of what Defendants knew, or had reason to know of when acting or failing to act are taken together with Dr. Healy's expert opinion, Mattson's symptoms of induced

21

suicidality, and the alleged failure to monitor and warn by Defendants—reasonable minds could disagree on whether Defendants' acts and omissions here created an "unreasonable risk of harm" with a "high degree of probability" that Mattson would attempt suicide.

Notably, Defendants argue that the weight of Dr. Healy's opinion should be discounted because it was offered in support of the medical "negligence" claims against Defendants, and not a more specifically pleaded claim of "reckless, willful and wanton conduct[.]" However, where liability is disputed, "an allegation of negligence is sufficient to put a defendant on notice that its liability will not be statutorily capped if its conduct is found to have arisen to the degree of recklessness." *Carrillo*, 152 Idaho at 751, 274 P.3d at 1266. That principle—that an allegation of negligence is sufficient to put a defendant on notice that the degree of negligence could amount to recklessness—applies here. Moreover, at summary judgment, all reasonable inferences are drawn in favor of the nonmovant (Mattson and her husband). *See Harris*, 123 Idaho at 298, 847 P.2d at 1159. Thus, Defendants' "no weight" argument against Dr. Healy's expert opinion is both without merit and misplaced at summary judgment.

Duty, breach, and causation will likely be hotly contested if this case proceeds to trial. But for purposes of this appeal, postured under the summary judgment standard, Mattson has alleged and offered sufficient evidence to create a triable jury question on the "reckless, willful and wanton conduct" exception to immunity. Accordingly, Defendants are not entitled to summary judgment on the immunity exception because reasonable persons could disagree on whether the alleged "breach" of the standard of care by Defendants goes beyond simple negligence, and rises to the level of "reckless, willful and wanton conduct" under Idaho Code section 6-904A.

## IV. CONCLUSION

For the reasons set forth above, the judgment of the district court is vacated; its decision at summary judgment that the "mental health center, hospital or similar facility" clause in Idaho Code section 6-904A(2) immunizes Defendants from Mattson's and her husband's claims of simple negligence is affirmed; and its decision that the "reckless, willful and wanton conduct" exception to immunity in section 6-904A does not apply as a matter of law is reversed. This case is remanded for further proceedings. Mattson is awarded costs on appeal under I.A.R. 40(a).

Chief Justice BEVAN, and Justices STEGNER, MOELLER, and ZAHN, concur.